The City of Chicago, Plaintiff-Appellee, *v.* Eugene A. Busch, Trustee under Trust No. 9357, *et al.*, Defendant-Appellants.

(No. 53817;

First District—March 2, 1971.

Maurice J. Nathanson and Eugene A. Busch, both of Chicago, (Paul Peter Black, of counsel,) for appellants.

Raymond F. Simon, Corporation Counsel, of Chicago, (Marvin E. Aspen and Gayle F. Haglund, Assistants Corporation Counsel, of counsel,) for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This appeal brings for review a demolition decree and a judgment that imposed a lien on real estate. Although state and federal constitutional questions are presented, the issue we resolve is whether the demolition decree is supported by evidence. The controversy is between plaintiff City of Chicago and defendants Eugene A. Busch, Harold L.

Feigenholtz and Jesse Fields concerning a three-story building situated in the city at 3824 West Jackson Boulevard.

On December 12, 1967, plaintiff filed a two-count chancery complaint alleging, in Count I, that defendants Busch (as Trustee) and Feigenholtz owned or had an interest in the building. It was alleged that there then existed twenty-one uncorrected violations of the city building code. Plaintiff prayed for assessment against defendants of $4,200.00 as a fine for each day the violations were allowed to exist. Count II realleged Count I and added that levying of a fine was not an adequate remedy for abatement of a nuisance; that issuance of a temporary and permanent injunction and appointment of a receiver were necessary to bring the subject property into compliance with the code; and that "[t]he duly appointed Commissioner of Buildings of the City of Chicago, has determined said building to be dangerous and unsafe or uncompleted and abandoned." Plaintiff prayed for equitable and legal relief.

Defendants were summoned to appear and answer the complaint, being told that "[i]f you fail to do so, a judgment by default may be taken against you for the relief asked in the complaint, and a warrant may be issued for your arrest." No answer was ever filed nor were defendants defaulted. Although there was no formal appearance, on February 15, 1968, a bill totalling $959.62 for repairs of the building was submitted to the court on a letterhead of the defendant Fields. On March 21, Busch, describing himself as an attorney appearing *pro se,* appeared for defendants.

From the sparse and somewhat confused record before us, it appears that by an order of February 21, 1968, the trial court found that the building at 3824 West Jackson Boulevard "[f]ails to conform in certain instances to the minimum standards of health and safety as set forth in the applicable ordinances of the City of Chicago." Because the building was "unfit for human habitation," defendants were ordered to vacate the entire building and board it up. The Relocation Division of the Department of Urban Renewal was directed to assist the tenants to find suitable living quarters elsewhere. On March 21, 1968, when Busch appeared, he expressed consent to the order. He was asked by the trial judge, "What are you going to do with the building?" Busch answered, "I think we're going to work out some deal—somebody can go and get a permit to do some work on it." The cause was then continued from time to time until June 5, 1968.

On that day the assistant corporation counsel speaking for plaintiff-appellee, reviewed the status of the case. He told the trial judge that defendant-appellant Fields was going to purchase the property. A building inspector was called who testified to the inspection he made of the

building the day before. He found it was not boarded as the court had ordered. Busch then called a former deputy commissioner of buildings of the City of Chicago who described his inspection of the building that day. He said he had talked with the new purchaser and that an architect had drawn rehabilitation plans to be presented to the Building Department. For the balance of the hearing there was a colloquy between the trial judge and Busch concerning the building, its sale to Fields and the desire of the new owner to proceed with rehabilitation. The cause was then continued one week.

When it was before the court again, the assistant corporation counsel told the court that "[t]he case is here today for a progress report, * * * ." The same building inspector was called and reported that the building was boarded front and rear. The cause was then continued to July 10. On that date Busch reported to the court that "[w]e understand from the architect that the permit will be out either tomorrow or the next day." A building inspector was called who reported that an inspection the day before disclosed the building vacant and boarded. The cause was then continued to July 24, 1968. On that day Busch and Fields were in court. After telling the trial judge that "[r]epresentations were made by the defendant that plans for the rehabilitation of the property would be completed within a day or two, and permits obtained," the assistant corporation counsel called a building inspector who testified that a permit had issued to deconvert the basement apartment and enclose stairways, halls and apartment separations. The trial judge asked who was going to do the work. Fields responded, saying he was going to do it himself. The assistant corporation counsel then told the court that "[u]nder these conditions the City will agree to a continuance of this matter for the work to get under way." In answer to a question by the trial judge, Fields replied, "We are getting a loan now, and I understand it takes quite a few days, but as soon as we get the loan we will start to work." The court then continued the case to September 18, 1968.

On September 11, however, with Busch representing the defendants, the case was called on "[t]he City's motion for a hearing instanter." The trial judge reminded Busch that the building was to be rehabilitated. Busch replied that the plans for rehabilitation of the building had been approved by the "neighborhood service program" and that a permit had been issued by plaintiff. The hearing proceeded with plaintiff calling a building inspector who testified that the day before he inspected the premises, he found the building vacant and boarded but no evidence of work in progress. He reviewed his previous inspections of the building and he said, "[a]t that time I found the building to be twelve per cent depreciated. To the best of my knowledge it remains the same." Then

followed a colloquy between court and counsel. The assistant corporation counsel called attention to the background of the case, its numerous continuances and defendants' representations that they were going to rehabilitate the building. Busch on behalf of defendants reiterated the transfer of ownership of the property to Fields, the application for the loan and the issuance of the permit by plaintiff. The trial judge reviewed the history of the case and then for the first time said that plaintiff was requesting a decree of demolition. When Busch asked to be told the basis for the decree, the trial judge said, "[t]he basis is that you have a building that is vacant and boarded, and that Statute states that a vacant and boarded building is no defense, * * * ." The court then continued the case one week "[f]or prove up on the City's motion for demolition, * * * ."

On September 18 the "prove up" was heard. Plaintiff called two building inspectors. One described his viewing of the premises two days before. He said that "[t]he building was vacant and the rear was open. The front door was locked and there were several broken windows." The other inspector testified that he had gone to the building the day before and found it vacant, open and vandalized. He described the plumbing as partially stripped, the radiators broken. He found broken sashes and broken glass; and the rear porches and front masonry stairs were in need of repair. The plaster was loose and cracked throughout the building. "I estimated the building to be eighteen per cent depreciated at the time of that inspection." When asked if he saw any evidence of work being done on the premises, he answered, "There was none to my knowledge."

The balance of the hearing consisted of colloquy between court and counsel. Busch repeated the application for the loan, plaintiff's issuance of the permit and the desire of defendants to rehabilitate the building. The trial judge reviewed the history of the case and reminded Busch of the failure to proceed with rehabilitation. The assistant corporation counsel insisted on issuance of the demolition decree. After denying Busch's request for an additional thirty days to await completion of the mortgage transaction and processing of the loan, the court said, "Let the record show that from the testimony and evidence the decree of demolition is allowed with lien and or judgment to attach for cost of demolition and court cost." The next day a "Decree of Demolition—Emergency" was entered in which the court "having heard evidence and being fully advised in the premises" found it had jurisdiction of the parties and of the subject matter; that plaintiff "has fully sustained the material allegations of the Complaint, and that the building located on the above premises is dangerous and in an unsafe condition * * *

that the necessary costs and expenses of abating the nuisance by the said demolition of the building or structure be charged against the defendant owner of said premises  *  *  *  to attach [as] a lien against the aforesaid premises in accordance with Chapter 24, Section 11—31—1,  *  *  *  ." The court retained jurisdiction to ascertain the costs and enter a money judgment. A short time later the trial judge was informed that the building had been demolished; and on December 13, 1968, a judgment was entered against defendants Busch and Feigenholtz in the sum of $2,335.00 for the expenses of demolition plus court costs.

In attempting to show that the record lacks evidence to support the demolition decree, defendants contend it was plaintiff's burden to prove that the demolished building was dangerous beyond repair. Thus, defendants argue, the trial court finding only that the building was dangerous and in an unsafe condition did not justify its destruction. Defendants point out that in *City of Aurora v. Meyers,* 38 Ill.2d 131 at 137, 230 N.E.2d 200, the Supreme Court speaking of the statutory basis for this suit, section 11—31—1 of the Illinois Municipal Code, said,

 "[T]he plain implication of the act involved here is that if the property can be repaired with comparatively little expense the city ought to adopt this course rather than complete demolition, that only in cases where the structure is substantially beyond repair is an order for demolition contemplated.  *  *  *  The cast of repairs may well be a small fraction of the building's value. The court should find from the evidence what the specific defects are which render the building dangerous and unsafe.  *  *  *  "

To meet these contentions plaintiff argues that defendants' failure to deny its complaint was an admission that the allegations were true and that the described municipal code violations existed. "There is no question," plaintiff says, "that the trial judge had ample evidence before him to determine that a public nuisance did indeed exist  *  *  *; [he] ordered demolition not because the building had been shown to be beyond repair, but rather because defendants, after an ample opportunity to do so, were obviously incapable of repairing the building."

■■ From like cases, it appears the law is settled that courts go no further than is necessary to protect public interests. (*City of Danville v. Hartley,* 101 Ill.App.2d 31, 241 N.E.2d 460.) Under authority of section 11—31—1 of the Illinois Municipal Code, property may be ordered destroyed under certain conditions but only if the danger cannot be abated in any other way. It is only in cases where an absolute necessity exists that courts adopt the drastic method of correction by ordering destruction of private property. (*Childs v. Anderson,* (1955), 344 Mich. 90, 73 N.W.2d 280; *Echave v. City of Grand Junction* (1948), 118 Colo.

165, 193 P.2d 277.) In every instance the remedy which a city can obtain in a court exercising equitable powers is limited to the necessities of the case. Where hazardous conditions can be remedied by repair without major reconstruction of the property, the building may not be destroyed. (Compare *Albert v. City of Mountain Home* (1959), 81 Idaho 74, 337 P.2d 377.) It follows therefore, that unless plaintiff has proved the building in this case could not be repaired and the municipal code violations corrected by means other than complete destruction, it had to seek relief other than demolition. *City of Aurora v. Meyers, supra.*

In the trial court, and before us, defendants concede their building was in need of repair. They complain, however, that as required by *City of Aurora v. Meyers,* the demolition decree did not contain findings of the specific defects which made the building dangerous and unsafe; nor did it contain findings of fact to support the conclusion that the building was a "nuisance." In fact, plaintiff's witnesses testified that at worse the building had depreciated 18%. The record is silent concerning the value of the property, the costs of the repairs or the condition of the structure so it could be determined whether it was beyond repair.

██ The record before us reflects a primary concern by plaintiff and the trial judge about defendants' failure to rehabilitate the building. Indeed, plaintiff with commendable candor, insists it was this failure that justified entry of the demolition decree. This concern, however, overlooks that defendants had obtained a permit to make the repairs and had made an application to another department of plaintiff's city administration to obtain the funds for the rehabilitation they had planned. We see an anomaly in defendants, in apparent good faith, seeking a permit, plaintiff issuing one and at the same time insisting on demolition of defendants' property without proof that its complete destruction was necessary, only because the owners (as plaintiff argues in this court) "[w]ere obviously incapable of repairing the building." Our review of the record leads us to conclude that the necessity for the demolition decree was not proved. (*City of Danville v. Hartley, supra.*) Accordingly, we reverse the decree of demolition and the judgment against defendants and remand the cause with directions that the trial court take further proceedings consistent with the views herein expressed.

Decree and judgment reversed and cause remanded with directions.

BURKE and LYONS, JJ., concur.