THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* GENERAL REALTY CORPORATION *et al.*, Defendants-Appellants.

(Nos. 54259, 54474 cons.;

First District—July 14, 1971.

*Rehearing denied September 9, 1971.*

Jacob L. Fox, Eugene L. Resnick, and Richard A. Kabaker, all of Brown, Fox & Blumberg, of Chicago, for appellant North American Co. for Life and Health Ins.

Charles Kraut, *pro se.*

J. Edward Jones, of Blue Island, for appellant Robert A. King.

Richard L. Curry, Corporation Counsel, of Chicago, (Marvin E. Aspen, Edmund Hatfield, and Howard C. Goldman, Assistant Corporation Counsel, of counsel,) for appellee.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

This is an appeal from an order of the Circuit Court of Cook County entered May 26, 1969, placing an earlier demolition decree entered February 28, 1969, in full force and effect.

The property involved here was a three-story brick building containing 23 dwelling units and five stores, located at 1153-57 North Spaulding and 3253-59 West Division Street in the City of Chicago. On May 3, 1968, the building was investigated by a City building investigator, and on the basis of this investigation a complaint was filed by the City on June 19, 1968. The complaint alleged several violations of the Municipal Code of Chicago: (1) need for repair of walls and ceilings of the basement and second floor bathroom, (2) loose or broken plaster on ceilings and sidewalls in all apartments, (3) broken, missing and defective window panes, (4) basement units with inadequate separation from other parts of the building, substandard partitions and inadequate light and ventilation, (5) rats and unsealed rat holes, (6) no adequate garbage and refuse containers, and (1) accumulation of refuse and debris in basement and rear yard. The complaint was later amended to add defective porches as a violation. Count 2 of the complaint provides in part:

"That Sidney D. Smith, the duly appointed Commissioner of Buildings for the City of Chicago, has determined said building to be dangerous and unsafe or uncompleted and abandoned."

To determine the ownership of the building the City conducted a title search, which disclosed three names: General Realty, Chicago Title & Trust Company, and Al Abraham. The title search also showed that the 1966 taxes were paid by General Realty Corporation but the tax bills went to Al Abraham. On June 25, 1968, service was made on Chicago Title & Trust Company, but General Realty could not be found and Al Abraham had moved.

In April, 1968, General Realty had sold its interest in the property to the First National Bank of Blue Island. However, this transaction was not recorded in the tract book until August 28, 1968. The First National Bank of Blue Island held the title in a trust for Robert A. King, who was named as beneficiary, but the real beneficial owner was J. Edward Jones, who used King as his nominee. As of August 1, 1968, the deed in favor of King and Jones had not been recorded.

The summons was returnable on July 16, 1968, and on that date a hearing was held at which a City building inspector who had investigated the property testified the building contained the violations specified in the complaint. The court concluded the dangerous conditions on the property constituted an emergency, and the court thereupon appointed

Number 2 Chicago Dwellings Association as receiver, to vacate the premises.

There was a hearing on August 1, 1968, at which all the parties were present, including King and Jones; first mortgagee, La Salle National Bank; and second mortgagee, Charles Kraut. The court noted the alleged violations were mainly "housekeeping items," but there was testimony the peeling paint, falling plaster, rats, and other violations created an emergency situation which justified the appointment of the receiver, especially since there were many children living there.

At the numerous hearings which followed, the court heard testimony from the tenants and the Department of Public Aid to allow the tenants to remain and to see that the building was repaired. At a hearing on August 30, 1968, the attorney representing Jones claimed a licensed contractor had agreed to put the building in compliance with the building ordinances for $5,375. This cost included repair of the porches, plastering, painting and electrical work.

The new first mortgage holder, North American Company for Life & Health Insurance, informed the court it would forego filing a petition for foreclosure for "two or three weeks" to allow Jones a chance to raise the money for the repairs.

At the September 26 hearing, North American told the court the contemplated repairs had not been done yet. The court suggested North American file a petition to foreclose so that a foreclosure receiver could be appointed to manage the property. The court then discharged the Chicago Dwellings Association as receiver for the property and continued the case, but did not set a specific date for the next hearing.

A chancellor, presiding over the foreclosure proceedings, appointed a new receiver, Tully Trainor, who took possession of the property. The first mortgage holder subsequently advanced approximately $3,200 for the repair of the porches and additional money for other repairs to maintain the building. At a hearing in the demolition court on February 21, 1969, a City inspector testified that three or four apartments had been rented out in violation of a court order. These apartments were among those in a deteriorated condition, and among the new renters were families with several children.

At the same hearing the inspector was asked whether there had been any progress during the period of proceedings since June of 1968:

"A. In regards to work in progress; at one time they had a couple of carpenters repairing the rear porches, and I would say that they are ninety per cent complied.

Q. Is the building getting better, or worse?

A. The only work that I was able to detect in the interior of the

building was that they converted the front room into two bed-rooms, and they cut it down the middle and they are using the front room as two bedrooms, and this was done without plans or permits."

The court then ordered Tully Tranor to vacate the premises instanter and allowed the City's motion for a decree of demolition. Mr. Kraut asked for a stay of the decree of demolition, and the court stated:

"The decree will not be stayed. The testimony of the witness shows that the building has gone from bad to worse. There are many hazards * * *."

At a hearing on April 11, 1969, the order of demolition was stayed to permit rehabilitation through sale of the interest of the two mort-gagees and Jones to a party who would promise to adequately repair the building. However, negotiations for the sale fell through because of an inability to clear title, and on May 26 the court granted the City's motion to place the decree of demolition in full force and effect.

On May 26 Jones filed a motion for a *supersedeas* bond, but because proper notice was not served on all parties in interest, the motion was stricken. No further efforts were made to secure a bond. The building was then demolished at a cost of $7,963.

The defendants' first argument is there were insufficient grounds to warrant demolition under Chapter 24, sec. 11—31—1, of the Illinois Revised Statutes. It provides in part:

"The corporate authorities of each municipality may demolish, repair, or cause the demolition or repair of dangerous and unsafe buildings or uncompleted and abandoned buildings."

The defendants also rely on *City of Aurora v. Meyer* (1967), 38 Ill.2d 131, which interprets that statute. In that case a building was torn down without comparing the cost of repair with the value of the building and without giving the owner an opportunity to make the needed corrections. The court said:

"The law is well settled that in cases of this nature courts do not go further than is necessary to protect the public interest. Prop-erty may be ordered destroyed under certain conditions but only if the danger cannot be abated in any other way. It is only in cases where an absolute necessity exists that courts adopt the drastic method of correction by ordering destruction of the prop-erty."

The court further said:

"Although not expressed in so many words, the plain implication of the act involved here is that if the property can be repaired with comparatively little expense the city ought to adopt this

course rather than complete demolition, that only in cases where the structure is substantially beyond repair is an order for demolition contemplated \* \* \*. The cost for repairs may well be a small fraction of the building's value. The court should find from the evidence what the specific defects are which render the building dangerous and unsafe. If they are such as may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs."

However, the situation is different here. In this case the reason for destruction was a dangerous condition which was not abated over a period of ten months. There were many hearings during which the defendants promised to place the building in compliance with City ordinances but never did. In the *Meyer* opinion the court stated:

"If they are such as may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs."

■■ Because of the owner's delay in complying with the ordinances, the legislative policy behind section 11—31—1 called for demolition of the property. The defendants had ten months in which to make changes they said would cost only $5,375, yet they did not. The demolition decree of February 28, 1969, was stayed several times in an effort to save the building, and there were many hearings prior to that decree to determine the fair and proper course to be followed. But the only compliance was fixing the porches and several other minor items. All the rest of the violations had remained the same or had gotten worse.

In *City of Chicago v. Mulligan Entrprises* (1960), 27 Ill.App.2d 481, the City waited two and one-half years after a fire to order demolition, and the court said the City had proceeded "far more leisurely than the urgency of the statute contemplated." In the instant case, the court waited ten months before losing faith in the promises of the defendants. This allowed a substantial time to invest a mere $5,375 in a building claimed to be worth $150,000. The policy behind section 11—31—1 is the expeditious protection of the public from the dangers of unsafe buildings. (*Chicago v. Logan* (1965), 56 Ill.App.2d 291.) After an ample time to repair goes by without compliance, the only other alternative is demolition.

■■ Whether the owners were given a reasonable opportunity to repair is a question of fact which will not be reversed unless it is against the manifest weight of the evidence. (*Brown v. Commercial National Bank* (1969), 42 Ill.2d 365.) In the case at bar the court received evidence of the condition of the building over a period of ten months. We think this was a reasonable length of time.

■■ In *Mulligan*, the court also considered the question of whether evidence of comparative values was a condition precedent to a decree of demolition. At page 489, the court said:

> "The next point made by defendants is that there was no proof either of the original or the deteriorated value of the premises. So far as Section 23—70.2 is concerned, no proof of value is necessary. The issue is whether the building was dangerous and unsafe or incompleted and abandoned."

The defendants next complain they did not receive notice of the July 16 hearing, therefore sufficient notice was not given and the appointment of a receiver was not justified. However, section 11—31—1 provides in part:

> "Where, upon diligent search, the identity or whereabouts of the owner or owners of any such building shall not be ascertainable, notice mailed to the person or persons in whose name such real estate was last assessed shall constitute sufficient notice under this section."

■■ We believe the title search conducted by the City constitutes a "diligent search" within the meaning of the statute. It was not the fault of the City that the proper parties could not be found. General Realty sold its interest in the property to the First National Bank of Blue Island in April of 1968, but that transaction was not recorded until August 28, 1968. The First National Bank of Blue Island merely held the property in a naked land trust for Robert A. King, the beneficiary, who in turn was the nominee of J. Edward Jones, who wanted to hide his ownership. The mortgagees also failed to record their interests.

■■ In addition, the defendants were not prejudiced by the failure to serve the unrecorded owners personally. The receiver was appointed at an *ex-parte* hearing on July 16, but he did not have authorization to collect rents until after August 7, 1968. All of the defendants had appeared in court by August 1, and had ample opportunity to argue the propriety of appointing the receiver. Although there were some unproven allegations claiming the receiver interfered with the collections of rent prior to August 7, the court was explicit that all rent prior to said date be paid to Mr. Jones.

The third argument is the demolition court erred in entering a decree of demolition because the foreclosure court and not the demolition court had jurisdiction. Their position is the demolition court was obliged to allow the foreclosure proceedings to terminate before it could take further action, and they also maintain the demolition court could not order the foreclosure receiver to vacate the premises because it did not have personal jurisdiction of him.

The arguments are not persuasive for several reasons. First, the demolition court never did abdicate jurisdiction. Charles Kraut, the second mortgagee, stated that on September 26, 1968, the demolition court "continued this matter without a date." Also, on September 26 the demolition court continued a motion by Jones which would have dismissed the First National Bank of Blue Island as a party. Thus, the conduct of the court and the belief of the parties show the court never relinquished jurisdiction.

It is argued, nevertheless, that once the forclosure court enters the matter, the demolition court is bound not to interfere until those proceedings have run their course. Such is not the case here. The general rule is that where two actions or proceedings between the same parties, on the same subject and to test the same rights, are brought in different courts, the court which first acquires jurisdiction may dispose of the entire matter and no coordinate court is at liberty to interfere with its action. (*Shilvock v. Shilvock* (1961), 31 Ill.App.2d 254.) The action in the foreclosure court was an action between private individuals. The action in the demolition court was an action by the City to enforce ordinances for the protection of the public. It cannot be maintained that the City is powerless to protect the people while private parties are settling their financial affairs.

Secondly, the receiver had been discharged by the foreclosure court before he had done anything to vacate the premises. Furthermore, if the demolition court had needed to acquire personal jurisdiction over the foreclosure receiver, it did so at the April 11 hearing, because he was represented by counsel at that time.

Jones complains that the Chicago Dwellings Association was not a proper receiver because it was an interested party, since it was controlled by the City. However, the case he cites in support of his argument (*Baker v. Administrator of Backus* (1863), 32 Ill. 79), involved a receiver who was appointed for a private debt claim. The reason for receivership here is the violation of a city ordinance, not a dispute between private parties.

Jones also complains he did not have the written notice of demolition as provided in section 11—31—1, which allows an opportunity to repair:

> "The corporate authorities shall apply to the circuit court of the county in which such building is located for an order authorizing such action to be taken with respect to any such building if the owner or owners thereof, including the lien holders of record, after at least 15 days' written notice by mail so to do, have failed to put such building in a safe condition or to demolish it."

The purpose of the statute is to give the defendant an opportunity to repair if he wants to. (*City of Chicago v. Mulligan Enterprises* (1960), 27 Ill.App.2d 481; *City of Danville v. Hartley* (1968), 101 Ill.App.2d 31.) In the *Hartley* case, the court said:

> "Considering that this matter has been in litigation for ten years, it is obvious that the continuing litigation has served the function of the notice and that, under the facts and circumstances here, the notice is not a condition precedent to further proceedings."

Jones had notice of the proceedings since August 1, 1968, and the demolition order was not entered until February 28, 1969, but not placed into full force and effect until May 26, 1969. Jones had much more than the minimum fifteen days to repair and failed to do so.

For the reasons stated, the judgment of the Circuit Court is affirmed.

Judgment affirmed.

ADESKO, P. J., and BURMAN, J., concur.