THE CITY OF ALTON, Plaintiff-Appellee, *v.* ROBERT H. CARROLL *et al.*, Defendants-Appellants.

Fifth District   No. 81—392

Opinion filed September 9, 1982.

James S. Reeves, Jr., of Alton, for appellants.

James E. Schrempf, of Alton, for appellee.

JUSTICE JONES delivered the opinion of the court:

Defendants Robert and Barbara Carroll appeal from a judgment of the circuit court of Madison County ordering the demolition of a building found to be "dangerous and unsafe" under section 11—31—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 11—31—1) and section 5—1—8 of the City Code of Alton, Illinois. They contend that there was insufficient evidence to establish that the building is dangerous and unsafe and that the trial court erred in not specifying in its judgment the particular defects which rendered the building unsafe. Defendants further contend that the court failed to provide them a reasonable opportunity to repair the building in question prior to ordering its demolition and so violated their constitutional rights of due process. Defendants also assert that the trial court erred in ordering the demolition of a building having historical and architectural significance.

The building here involved is an L-shaped, two-story brick structure located in a residential area of the city of Alton. It is a "vintage" structure, dating from before the turn of the century. Prior to 1977, the building was used for multiresidential purposes under a nonconforming use status in an area that is zoned for single-family residences. After being vacated in 1977, the structure was damaged by two different fires, one in 1977 and one in 1980. Following the first fire, the doors and windows were boarded up and a chain link fence was erected around the building.

On May 16, 1977, the Carrolls were notified by a letter from the Alton city building inspector that the building had been inspected and found to be "totally vacant, vandalized, and open at a number of windows." They were given 30 days in which either to demolish the structure or repair it to comply with the minimum standards of the city's building, electric, and plumbing codes. In spite of this and similar correspondence subsequently received by the Carrolls, they made no improvements to the building other than to secure it against further vandalism as described.

On February 22, 1981, the city of Alton filed a complaint against the Carrolls, as owners of the subject property, and the Greenland Co., Inc., and the Farmers State Bank of Greenfield, as mortgagees of the property, seeking an order authorizing the demolition of the building in question. The complaint alleged that the building was dan-

gerous and unsafe in that it was "open at door and window; structurally unsound; fire hazard; generally deteriorated; and beyond reasonable repair." The complaint further alleged that the total cost to repair the defects would exceed the market value of the property as repaired and that the defendants had failed to repair or demolish the building upon notice to that effect by the City.

At trial Rhaban Hoene, Director of Building, Housing and Zoning for the city of Alton, testified that, as a result of the two fires in 1977 and 1980,

> "[t]he interior [of the subject building] is completely gutted. What we have is an outer shell of masonry, and we have a roof plus interior walls; but there was some structural damage to ceilings and also walls. The building is not in a state of collapse to define it; but we have a fire-gutted shell, and that's all. There is evidence of further deterioration on the outside due to the elements working on it and especially in corners where the soffit has deteriorated to the point of falling out * * *."

Mr. Hoene stated further that some of the bricks have actually fallen, and that the fire damage was so severe that the electrical and plumbing services would have to be redone entirely, both as a matter of necessity and in order to meet minimal housing codes. Heating and cooling services are also nonexistent. The ceilings are burned through with holes of various sizes between the two floors, some large enough to warrant the replacement of entire ceilings.

Mr. Hoene stated that in his opinion the cost to improve the structure would exceed the market value of the house when so improved. His opinion was based upon the expenditures necessary to rehabilitate the house so as to bring it within the minimal standards of the housing code.

On cross-examination Mr. Hoene testified that because the walls of the house were of brick, its structural integrity was not impaired by the fires but that it would be necessary to replace weight-bearing components such as ceiling beams in order to make the building useable.

Dr. Carroll, defendant and owner of the house, testified that he had trouble stabilizing the house after he purchased it in 1976 because it was vandalized repeatedly. His intention at that time was to restore it for use as a single-family residence but, while he has made some improvements to an auxiliary structure on the back of the house, he has not significantly improved the main structure. During this period of time, he has maintained a dusk-to-dawn light on the back corner of the lot. He checks the premises regularly and hires a man to keep the

yard mowed.

Phil Poehner, a professional real estate broker specializing in old house sales and renovations in the inner city of Alton, testified that the building in question has been identified by the Illinois Register as one of the top 50 architecturally significant buildings in Alton, although it has not yet been listed on the Register. The defendants have engaged Mr. Poehner to sell the house and have it listed with him for $15,000. He testified that the house could be renovated for $30,000. Renovation would include adding two full baths and a complete kitchen, doing the dry wall, floor work, window and door restoration, repairing the brick on the back of the house which has been partially demolished, putting in all new wiring, plumbing, heating and central air, and decorating it with good wallpaper. Mr. Peohner estimated that the fair market value of the house after being so renovated would be between $49,900 and $54,000. His figures were based on a replacement cost factor less depreciation and also comparable market values of properties of similar size in similar neighborhoods.

Mr. Poehner stated that when he was in the house four years ago it was in a dangerous and unsafe condition but that it was not presently dangerous because it would be very difficult to enter the building. Even assuming that the cost of repairing the structure would be greater than its market value when repaired, Poehner was of the opinion that the house should not be demolished because of its architectural merit.

In its judgment entered on June 10, 1981, the trial court found the structure to be "dangerous and unsafe and not reasonably repairable." The court noted that the building has been gutted by two serious fires, that vandals have removed certain fixtures and that large holes exist in the ceilings and floors. It is located near a public park which contains a playground, a golf course and ball diamonds. The court further stated that while the building is presently boarded up and fenced, there has been no attempt to repair it since it was first burned and, under the statute, it is not a defense to an action for an order of demolition that the building is boarded up or otherwise enclosed. It was the court's finding, "based on the evidence at trial, that the state of deterioration is such that repairs to be adequate would amount to substantial reconstruction." The court therefore ordered that the city be authorized to demolish the building and that the cost of the demolition be a lien on the property.

The statute at issue in this suit, section 11—31—1 of the Illinois Municipal Code, provides in pertinent part:

"The corporate authorities of each municipality may demol-

ish, repair or cause the demolition or repair of dangerous and unsafe buildings or uncompleted and abandoned buildings within the territory of any such municipality \*\*\*. No building may be boarded up or otherwise enclosed. The corporate authorities shall apply to the circuit court of the county in which such building is located for an order authorizing such action to be taken with respect to any such building if the owner or owners thereof, including the lien holders of record, after at least 15 days' written notice by mail so to do, have failed to put such building in a safe condition or to demolish it. It is not a defense to such cause of action that the building is boarded up or otherwise enclosed nor may the court order such building boarded up or otherwise enclosed." (Ill. Rev. Stat. 1979, ch. 24, par. 11—31—1.)

Section 5—1—8 of the City Code of Alton reiterates this language in reference to the corporate authority of the city of Alton.

■ In urging this court to hold that the evidence did not support the trial court's finding that the building in question is "dangerous and unsafe," defendants stress the security measures they have taken to prevent access to the building. Section 11—31—1 provides, however, that it is no defense in an action of this nature that a building is boarded up or otherwise enclosed. (See *City of Chicago v. Birnbaum* (1971), 49 Ill. 2d 250, 274 N.E.2d 22.) While the measures taken by defendants were desirable as a temporary safeguard against the potential hazards of the vacant building, defendants will not be allowed to avoid the effect of the statute and "borrow time" for their renovation effort by merely boarding up the building. The determination, therefore, of whether the building is "dangerous and unsafe" must be made without regard to these temporary protective measures.

■ From the evidence adduced at trial, we believe the trial court was justified in finding the subject building "dangerous and unsafe." As noted in the court's judgment, the building has been damaged by two fires which left the interior gutted with large holes in the ceilings and floors. When trial commenced approximately four years after the first fire, defendants had yet to make any repairs or improvements to the structure. Such delay may properly be considered by the trial court in finding a building "dangerous and unsafe." (*City of Chicago v. James E. Mulligan Enterprises, Inc.* (1960), 27 Ill. App. 2d 481, 170 N.E.2d 13.) Further, the court noted the location of the subject building in the proximity of a part containing a playground and ball diamonds. This, too, is a valid consideration in finding that the building constitutes a hazard to the public. (*Cf. Village of Gurnee*

*v. Miller* (1975), 25 Ill. App. 3d 915, 323 N.E.2d 416, where the proximity of a grade school to the building in question was properly considered in ordering its demolition.) Finally, while technical violations of city housing code provisions will not, of themselves, sustain a finding of danger to the public (*City of Chicago Heights v. Furrer* (1981), 99 Ill. App. 3d 414, 425 N.E.2d 1125), testimony by the building inspector in the instant case that the structure would have to be completely renovated to comply with the minimal standards of the city's building, electric and plumbing codes provides additional grounds for the trial court's decision.

Defendants contend further that the trial court erred in failing to specify each particular defect which rendered their building unsafe. In the leading case of *City of Aurora v. Meyer* (1967), 38 Ill. 2d 131, 230 N.E.2d 200, the supreme court reversed an order of demolition entered without a determination of whether the defects which rendered the building "dangerous and unsafe" could be readily repaired. The *Meyer* court, emphasizing the care with which a trial court should proceed in ordering the destruction of dangerous structures, held that "the statute, in providing for repair or demolition in the alternative, contemplates repair where feasible and demolition where the state of deterioration is such that repairs would amount to a substantial reconstruction." (38 Ill. 2d 131, 136, 230 N.E.2d 200, 203.) It was in this context that the court directed the trial court to "find from the evidence what the specific defects are which render the building dangerous and unsafe. If they are such as may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs." 38 Ill. 2d 131, 137, 230 N.E.2d 200, 204.

■ Under *City of Aurora v. Meyer*, then, the court in the instant case, after finding defendants' building to be "dangerous and unsafe," was obliged to determine from the evidence whether the building was so defective that repair would not be feasible. The court expressly found in its judgment that the building's interior is gutted, that large holes exist in the ceilings and floors, and that "repairs to be adequate would amount to substantial reconstruction." In addition to the findings articulated by the trial court, the record amply illustrates the basis for its decision ordering demolition of defendants' building. (*Cf. City of Aurora v. Meyer*, where the trial court heard no evidence concerning the possibility of repair or the cost of repair compared to the value of the building before ordering its demolition; *City of Chicago Heights v. Furrer*, where the trial court's demolition order stated only that the building was in a "dangerous and unsafe condition" and

there was no record from which to determine the basis of the court's finding; *City of Chicago v. Busch* (1971), 132 Ill. App. 2d 486, 270 N.E.2d 249, where the record was silent concerning the value of the property, the cost of repairs or the condition of the structure.) Witnesses for both plaintiff and defendants agreed that the building was a mere shell which would have to be completely renovated in order to be made safe and useable. Such renovation would include the replacement of structural components such as ceiling beams. Plaintiff's witness testified that in his opinion the cost to improve the structure to minimum housing code standards would exceed the market value of the house when so improved. There was also testimony by defendants' witness that it would cost $30,000 to renovate the house which is now listed for $15,000. While witness Poehner testified that the house when so repaired would be worth approximately $52,000, we note that, at the time the complaint was filed in the instant suit, the property was subject to two mortgages upon which the principal balances were $40,000 and $3,500. On this record we find that the court properly determined that the house is "not reasonably repairable" and that it was not error to order its demolition.

■ Defendants' contention that they were not afforded a reasonable opportunity to repair their building is without merit in this case where approximately four years elapsed from the time they first received notice of its defective condition to the time of trial. (*Cf. City of Chicago v. General Realty Corp.* (1971), 133 Ill. App. 2d 662, 273 N.E.2d 712, where the court held that the owner's 10-month delay in repairing his property to comply with city ordinances was, of itself, sufficient reason for ordering its demolition.) Defendants assert, in the first place, that the notice of May 16, 1977, from the city to repair or demolish the subject building was deficient in failing to specify the conditions which needed repair. While section 11—31—1 does not prescribe the form of notice required in a proceeding of this nature, the purpose of such notice is to give the owner the choice of demolishing the structure or putting it in safe condition. (*City of Chicago v. James E. Mulligan Enterprises, Inc.*) Here defendants were apprised in the notice of May 16, 1977, that the building must be repaired to comply with the minimum standards of the building, electric and plumbing codes of the city. Despite the general terms of this notice, it served to alert defendants that certain action was required on their part in order to avoid the alternative of demolition. Defendants, however, by their own admission, made no significant attempts to improve the structure to a livable condition as they hoped to locate a buyer for the property with the interest, talent and cash to restore it

to livable condition. While the notice given here may have been insufficient in a different factual context, in this case, where the building is so deficient as to be unlivable without complete renovation, we do not believe defendants were denied a reasonable opportunity to repair due to lack of information about what repairs were needed.

As to the second part of defendants' argument that the trial court should have allowed them the election to repair their building prior to authorizing demolition, we have already noted the court's discretionary power to choose demolition over repair when repair is not feasible. This is not a situation contemplated by the *Meyer* court where the property can be repaired "with comparatively little expense" or "at a fraction of the building's value" so as to warrant an order allowing the owners to repair. We believe the requirements set forth in *City of Aurora v. Meyer* have been met in this case and that defendants have consequently suffered no violation of their property ownership or due process rights by reason of the court's decision not to allow further time for repair.

■ There is, finally, no basis in statute or case law for defendants' contention that the court erred in ordering the demolition of a structure having "special historical and architectural significance." While a building's architectural interest, like true historical significance, may be a factor in determining its value and the feasibility of repairing or restoring it, this is not a decisive consideration in an action for demolition. The court's decision must be based, as here, upon whether public necessity requires the removal of the offending structure. *City of Aurora v. Meyer.*

Finding that the trial court proceeded with proper regard for the dictates of the applicable statute, we accordingly affirm the judgment rendered for plaintiff.

Affirmed.

KARNS, P. J., and WELCH, J., concur.