**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240408-U

Order filed December 19, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE COUNTY OF DU PAGE, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| MASUD ARJMAND, Individually and as | ) | |
| Trustee of the Masud Arjmand Trust, | ) | Appeal No. 3-24-0408 |
| MUNEEZA RAHMAN, UNKNOWN | ) | Circuit No. 20-CH-492 |
| OWNERS, AND NON-RECORD | ) | |
| CLAIMANTS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Masud Arjmand, Individually and as | ) | Honorable |
| Trustee of the Masud Arjmand Trust, | ) | Robert G. Gibson, |
| Defendant-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Hettel and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    The trial court did not err in granting plaintiff's motion for summary judgment as to both liability and damages on counts II, III, and IV of the amended complaint. As to liability, the trial court did not err in granting plaintiff's motion for summary judgment on the remaining counts of the amended complaint. The trial court abused its discretion in imposing fines for violations that allegedly occurred after the entry

of summary judgment. The trial court abused its discretion in its calculation of pre-judgment fines for counts I, VIII, X, and XI. The trial court did not abuse its discretion in its calculation of pre-judgment fines on the remaining counts. Affirm in part; reverse in part; and remand in part.

¶ 2    Defendant, Masud Arjmand, is the beneficiary and trustee of the Masud Arjmand Trust, which owned property in Naperville. In 2007, Arjmand was issued a building permit to construct a residence on the property. The permit expired in 2012, at which point construction was incomplete. Arjmand did not obtain another permit, and the residence sat vacant. In 2020, plaintiff, the County of Du Page, filed a 14-count amended complaint against Arjmand, alleging numerous ordinance violations, common law public nuisance, and dangerous and unsafe conditions warranting demolition or repair of the residence. Arjmand appeals from the circuit court's entry of summary judgment on plaintiff's amended complaint and the subsequent demolition order, the imposition of fines, and denial of Arjmand's motion for recusal. For the reasons set forth below, we affirm in part and reverse and remand in part.

¶ 3                              I. BACKGROUND

¶ 4    The following facts are derived from the pleadings. Arjmand is the trustee and beneficiary of the Masud Arjmand Trust, which holds legal title to the subject property located in Naperville. In 2007, Arjmand was issued a permit to construct a 14,000 square foot residence on the property. Arjmand was divorced from his ex-wife, Muneeza Rahman, in 2009, but they were embroiled in post-dissolution proceedings throughout the underlying litigation. In 2012, Arjmand's building permit expired, and he did not obtain a new permit to complete construction. The residence remained partially constructed and vacant for a number of years.

¶ 5    On August 9, 2018, following an administrative hearing, the property was found to be in violation of the Du Page County Code (County Code) for having "[o]pen buildings, broken

windows etc.[,]" as well as an expired permit. Arjmand and Rahman were ordered to board up the windows and doors on the first floor and remove all graffiti from the residence.

¶ 6　　　　On July 9, 2020, following a separate administrative hearing, the property was again found to be in violation of the County Code for being a "[v]acant house open, unsafe" and for having an expired permit. The order issued fines and continued, "House found to be a blight on neighborhood, nuisance and a[n] attractive nuisance to children. House to be demolished by Respondent or any authorized third party." On August 13, 2020, however, this order was vacated.

¶ 7　　　　On August 7, 2020, the County filed a four-count complaint against Arjmand, individually and as trustee. Rahman was also named as a defendant, although she was later voluntarily dismissed from the case. The complaint alleged the following conditions existed at the residence:

"20. On July 9, 2020, a County inspector was at the Subject Property and observed that the Principal Structure was vacant, unguarded, unsecured, and open and accessible to the public at one or more doors and, or, windows.

21. On July 9, 2020, a County inspector observed that numerous, possibly most, of the Principal Structure's exterior windows and doors were broken, or had been removed ***.

22. Additionally, the inspector observed on July 9, 2020[,] that the Principal Structure's skylights were broken and that approximately half of the exterior windows of the Principal Structure had been broken, with glass covering the Principal Structure's floors and on the ground around the Principal Structure's exterior. ***.

23. On July 9, 2020, the County inspector further observed that previously boarded up and secured doors had been forced or broken open to create an opening sufficiently large enough for a person to directly access the principal structure's interior.

3

24. On July 9, 2020, the County inspector also observed that there was murky water, approximately four feet (4') deep, in the basement of the Principal Structure. ***.

25. On July 9, 2020, the County inspector further observed that there was an open two-story (elevator) shaft between the first and second floors of the Principal Structure. Additionally, at the Principal Structure's front entry foyer, the second floor was open to the first floor without any barricade or railings. Moreover, one or more of the Principal Structure's interior staircases lacked railings and, or, handrails.

26. On July 9, 2020, the County inspector also observed that there was rubbish, construction debris, building supplies, junk and debris strewn about the Subject Property and within the Principal Structure ***. The debris included nails, splintered and broken wood, broken glass, assorted wires, and loose gravel on the floors.

27. The Debris observed on July 9, 2020, included combustible materials that could be used as fuel for fires. Furthermore, areas of the building displayed soot and smoke damage, and were littered with burnt wood, from small fires that had burned within the Principal Structure.

28. On July 9, 2020, the County inspector further observed that an overhanging portico (the Porte cochere) had begun to break away and detach[] from the Principal Structure and was at imminent risk of collapse onto the Principal Structure's front entryway.

29. On July 10, 2020, July 11, 2020, July 15, 2020, July 23, 2020, July 24, 2020, July 25[,] 2020, August 1, 2020, August 3, 2020, and August 4, 2020, the same County inspector conducted additional follow up inspections of the Subject Property and the Principal Structure and observed substantially identical dangerous and unsafe conditions on each of the dates listed above as that inspector had witnessed on July 9, 2020 ***."

4

¶ 8		In count I, the County alleged that the residence was an unsafe structure pursuant to section 8-127.4 of the County Code and that, despite receiving notice, Arjmand failed to abate the issues. The County sought the imposition of fines pursuant to section 8-117.4 of the County Code (a violation of the county's building code is punishable by a fine of not less than $100 and not more than $1,000, with each day in which the violation exists constituting a separate offense) and an order for Arjmand to either remove the residence or make it safe.

¶ 9		In count II, relying on section 5-1121 of the Counties Code (55 ILCS 5/5-1121(a) (West 2020)) (permitting counties to "demolish, repair, or enclose *** dangerous and unsafe buildings or uncompleted and abandoned buildings" and to "remove *** garbage, debris, and other hazardous, noxious, or unhealthy substances or materials from those buildings), the County sought an order requiring Arjmand to either remove the residence or to make it safe.

¶ 10		In count III, the County alleged that the property was a public nuisance at common law in that it presented (1) a higher risk of danger and hazard for first responders in the event of an emergency; (2) "a unique and heightened risk of fire, collapse, falling, drowning and electrocution"; (3) "an exceptionally large volume of 'calls for service' " to the sheriff's office; (4) an attractive nuisance for juveniles and had "already become a widely known location for illicit activities on social media"; (5) adverse impacts to neighboring residents "by generating excessive transient vehicle and pedestrian traffic"; (6) litter and debris, as well as potential encouragement for illegal dumping; (7) a blight; and (8) "a breeding ground for disease carrying mosquitos and other vectors" in the water-filled basement. The County again sought demolition. Similarly, in count IV, the County alleged that the property violated section 26-1 of the County Code in that it was a public nuisance.

¶ 11　　　　On August 25, 2020, the County filed an emergency petition for a temporary restraining order, citing the aforementioned hazards at the property and seeking either demolition or repair. Attached to the emergency petition were several affidavits. Steven Cyrier, Du Page County's chief building inspector, averred to the conditions of the residence as set forth in the complaint and emergency petition. Additionally, he indicated that he inspected the property on August 5, 2020, and the exterior and interior of the residence were covered in graffiti; the approved building plans included electrical and mechanical systems that were submerged in approximately four feet of water in the basement; areas of the second story floor deflected and bounced from two adults standing and walking on it; areas of the second story were open to the first story below; the second story had no barricades to prevent occupants from falling over ledges or through holes in the flooring; "bridge[s]" made of unsecured lumber covered openings on the second floor; egress from the second story was by an unfinished stairway or builders ladders ("a ladder assembled at a construction site using scrap pieces of lumber"); the portico was beginning to detach from the residence; and there existed "exposed conduits, wiring, junction boxes, fixtures, and outlets ***, which electrical components are not fully shielded from incidental contact, properly grounded, or securely installed."

¶ 12　　　　Also attached to the emergency petition were the affidavits of several Du Page County Sheriff's deputies. Deputy Kurt Barbour averred that he had responded to two service calls at the property and that on July 23, 2020, he was dispatched to the residence and detained three teenagers who unlawfully entered the residence. Deputy Andrew Kaefer averred that, on August 1, 2020, he was dispatched to the property by a local resident with concerns of trespassers. The resident indicated that he saw "two large groups of persons, appearing to be teenagers, exiting the residence." Kaefer and another deputy conducted a security check of the residence and noted that,

6

while most of the first story doorways had been boarded up, two doors at the back of the residence were unsecured. Deputy Robert Larson averred that he had responded to approximately five service calls at the residence in the past year. Specifically, on July 27, 2020, he assisted in detaining a group of seven juveniles who had entered the residence for a "concealed location to smoke marijuana." Deputy Eric Koty was dispatched to the property on May 13, 2020, for a report of " 'teens' breaking windows and vandalizing the residence." Upon arrival, he detained a group of three juveniles who admitted entering the residence through a broken door but denied breaking any windows. Deputy Edward Rose averred that, on August 16, 2020, he received a report of trespassing and found two juveniles and one adult at the property. They denied entering the residence and said they were taking pictures of the exterior. Chief Deputy Eric Swanson averred, *inter alia*, that the sheriff's office "receive[d] *** calls several times per week during the Summer months, sometimes daily, and typically on a weekly basis throughout the remainder of the year." He explained that previous board-ups did not resolve the trespassing issue and that "boarded up entry points [we]re regularly broken into and, or, the boarding removed."

¶ 13        Paul Hoss, Du Page County's zoning coordinator, averred, *inter alia*, that he had conducted multiple inspections of the residence. He stated that a smart phone application called Randonautica, which "identifies so-called 'places of interest' in the Chicago metropolitan region," listed the property and provided instructions for locating it. Hoss further explained that the property and residence are the subject of social media posts with the captions "urban adventure" and "haunted house." Hoss stated that the residence's broken windows; open doors; and accumulations of garbage, litter, and debris were visible from the public right-of-way and that the property was unsecured. Hoss stated that the interior was "showing signs of mold, mildew, and water saturation" and that new graffiti was added between his July 10, 2020, and August 14, 2020, inspections. Hoss

stated that he observed soot and smoke marks, as well as burnt wood, inside the residence from at least one small fire. Attached to Hoss's affidavit were various photographs showing the conditions described on the property and residence.

¶ 14    In response to the County's emergency petition for a temporary restraining order, Arjmand indicated that he hired a contractor to secure the residence. He included reports from a contractor documenting board-up work completed on July 30, 2020, August 4, 2020, and August 7, 2020. Arjmand stated that he visited the property on August 27, 2020, and noted three windows that had not been properly secured. Arjmand was in the process of finding a contractor to complete the work. He further explained that he had contracted with an internet service provider so he could install security cameras on the property but that the provider was delayed and gave him a tentative installation date of October 5, 2020. He had also received a quote to install a construction fence around the property. Arjmand provided an affidavit attesting to the facts set forth in his response.

¶ 15    Thereafter, the County filed a supplemental affidavit of Hoss. Hoss averred that, on August 27, 2020, he observed that some of the broken windows, doors, and entryways had been boarded up for the first time. However, some of the broken windows that had been boarded up on the second floor still had glass shards in the frame. He also noted that some of the first-floor windows that were not yet broken were not boarded. He further observed graffiti on the new boards. Several photographs depicting Hoss's observations were attached to his affidavit.

¶ 16    On August 31, 2020, the court entered a temporary restraining order directing Arjmand to complete certain work by the next day. He was ordered to board all points of entry, pump out the water in the basement, erect a six-foot fence around the property, and post "no trespassing" signs at regular intervals around the property. He was also ordered to have the portico inspected and

present the court with a plan to support or brace it. Arjmand was ordered to inspect the residence on a regular basis and promptly repair any condition that violated the temporary restraining order.

¶ 17     On September 1, 2020, Arjmand filed a motion to extend his time to comply with the temporary restraining order, explaining that the fencing project required JULIE clearance. Moreover, Arjmand indicated that he was informed that the second-floor windows could not be safely boarded, as the windows were aluminum and the weight of the boards would compromise their structural integrity. Arjmand requested that these windows be excluded from the reach of the temporary restraining order since they would be inaccessible once the fence was installed.

¶ 18     On September 2, 2020, the County filed a second supplemental affidavit of Hoss. Hoss averred that, on August 29, 2020, he encountered a contractor pumping water from the basement. He further represented that the contractor advised that water entered the basement from a broken pipe and that the residence "had electrical service, and that *** there was a crack in the well's supply line." The contractor informed Hoss that the well pumped continuously and constantly filled the basement with water. Hoss also inspected the property on September 2, 2020, and observed the following: not all windows and entry points had been boarded, several windows had broken glass hanging from the frames, glass was on the ground outside the residence, graffiti was on the side of the residence, there were no "no trespassing" signs, and no fencing was in place to prevent access to the property. Photographs depicting several of these conditions were attached.

¶ 19     The same day, the County filed a verified statement of Michael Mikula, a resident of a neighboring property. Mikula averred that, within the past 90 days, he had seen people on the roof of the residence and inside or near its entry way, observed "graffiti and spray-painted words" on the residence's exterior, broken glass around the perimeter of the residence, and trespassers disturbing the neighborhood by playing loud music and yelling.

9

¶ 20    On September 2, 2020, the court entered an order providing that Arjmand was to have the security fence completed by September 3, 2020. In the event Arjmand failed to make "substantial progress" in this work, the County was authorized to install the fencing. Arjmand was again ordered to provide the court with an expert report regarding the portico.

¶ 21    On September 3, 2020, the court (Judge Orel) conducted an evidentiary hearing via Zoom on the remaining requests for relief in the County's emergency petition for a temporary restraining order, as well as a status hearing on the other outstanding matters. The County called Hoss as its first witness. He had inspected the property that morning. Hoss testified, *inter alia*, that the portico was cracked in three places, starting to detach from the base of the residence, and beginning to sag. Hoss testified that the fence was only around the residence and not the entire property. Hoss further explained that approximately 15 windows had not been boarded up. Hoss testified that there was an open drainage pit on the property that had approximately three feet of water inside. Hoss also observed glass remnants on the property. Turning to the issues with the interior, Hoss testified that certain areas of the floor remained open to lower stories of the residence and described the lack of railings.

¶ 22    The County rested, and Arjmand testified in his defense. Arjmand was at the property at the time of the hearing. He testified that the fence was completed during the hearing and that he had given the fencing company the "no trespassing" signs to install. Arjmand represented that his contractor for the portico had to subcontract out for the evaluation of its structural issues. Arjmand explained the concern with boarding up the unbroken aluminum windows and that his contractor presented him with the idea of breaking them to board them up. However, Arjmand did not want to do this because they were expensive. As to the interior of the residence, Arjmand indicated that he directed the contractor to patch or board any areas that presented the risk of someone falling

10

through, as well as to block access to the basement. He stated that he was unable to confirm whether the work had been done because the house was boarded shut. Arjmand stated that he was unaware of the open drainage pit until the hearing and that he would have it fixed. Arjmand acknowledged that there were "very few" pieces of glass on the property but that he was going have it cleaned.

¶ 23    The court (Judge Orel) found both Hoss and Arjmand credible. In its September 3, 2020, written temporary restraining order, the court found that the County met its burden to establish its right to a temporary restraining order that mandated Arjmand "to remediate several dangerous and hazardous conditions" on the property. The court further found that the property constituted a "nuisance and pose[d] a risk to the public life, health, and safety[.]" Arjmand was ordered to secure the drainage pit; remove all glass and debris from the property; and provide the court with an expert's plan for the portico, a contractor's plan to secure all points of entry, and Arjmand's plan for how he would monitor the property daily until he could install security cameras.

¶ 24    The matter was continued for a status hearing on September 8, 2020. At that time, the County's counsel indicated that three windows remained unsecured. Arjmand's counsel indicated that the contractor did not have the specialized ladders to reach the three remaining windows when he originally went to the property and that he was unable to do it that day because it was raining. The County also informed the court that, while the drainage pit had been covered, it was with a piece of plywood rather than a steel grate. Arjmand's counsel clarified that Arjmand intended to order a grate but that he used wood in the interim. Finally, Arjmand agreed to visit the property daily until the security cameras were installed.

¶ 25    The September 8, 2020, order indicated that the temporary restraining order was extended through the next court date. Arjmand was ordered to inspect the property daily and order the repair

11

of any damage from breaches within 2 hours of receiving notice, with the remedial work to occur within 24 hours. Arjmand was to secure the remaining three windows, provide the court with a date for installation of the grate over the drainage pit, and provide a date for a structural engineer's review and report regarding the portico.

¶ 26　　　The matter was continued for a status hearing on September 10, 2020. At that time, the County confirmed that, as of that morning, all windows had been boarded up, there were "no trespassing" signs on the fence, the yard was "mostly" cleared of debris and glass, most of the basement was boarded up (with the exception of one opening in the "lower half basement"), and the basement was dry. However, the basement floor had become "incredibly slick, like an ice skating rink, with mildew and residue from the water[,]" the elevator shaft had six inches of water in it, and there were still missing railings and open cavities between the first and second floors. As to the water in the elevator shaft, Arjmand's counsel explained that Arjmand had recently discovered that two of the sump pumps were not working. He planned to replace them, at which time the remaining water would be removed. Arjmand's counsel further represented that Arjmand had just hired an engineer for the portico and that their work would begin the following week.

¶ 27　　　The court noted that Arjmand was "cooperating fully on everything for the most part." The corresponding written order extended the temporary restraining order to the next court date. The matter was set for a status hearing on October 1, 2020.

¶ 28　　　On September 18, 2020, the County filed a second emergency petition for a temporary restraining order. In it, the County alleged that, on September 13, 2020, Greg Koci, a Du Page County code enforcement officer, observed that the fence around the residence had been partially knocked down and that there were signs of a break-in at the residence. The County claimed that it notified Arjmand's counsel of the damage by e-mail on September 13, 2020, and September 14,

12

2020. As of September 14, 2020, Arjmand had repaired the windows and doors but had not fixed the fence. The County sought Arjmand's repair, restoration, or replacement of the fence. The County further sought redundant boarding at all first story points of entry. In response, Arjmand confirmed that the damaged boards were repaired on September 14, 2020, along with the boarding of the two remaining interior locations that were open. Arjmand indicated that the fencing company was not available to repair the fence until September 18, 2020, but that the work was completed the same day.

¶ 29     On September 21, 2020, the court (Judge Fullerton, substituting for Judge Orel) heard the County's second emergency petition. The written order provided that the County could complete necessary remedial work in the event Arjmand failed to do so within 72 hours of receiving notice of a breach at the property.

¶ 30     On October 1, 2020, before Judge Orel, the County verbally requested leave to file an amended complaint to "add specific property maintenance code violations or building code violations[,]" which was granted. The County also voluntarily dismissed Rahman from the case.

¶ 31     On October 14, 2020, the County filed its operative 14-count amended complaint. Counts I through IV were the same claims set forth in the original complaint.

¶ 32     In count V, the County alleged that Arjmand violated sections 8-112.1 and 8-112.3 of the County Code for lack of a valid building permit. The County claimed that, at all times since July 9, 2020, the residence was "an uncompleted building or structure having no valid building permit," as Arjmand had not been issued or applied for a completion permit. The prayer for relief included a finding that Arjmand had violated sections 8-112.1 and 8-112.3 every day since July 9, 2020, as well as an order that Arjmand obtain a completion permit or demolish the residence.

13

¶ 33    In count VI, the County alleged that Arjmand violated section 301.4 of the Property Maintenance Code[1] (vacant property "shall be maintained in a clean, safe, secure, and sanitary condition *** so as to not cause a blighting problem or adversely affect the public health or safety"). The County requested a finding that Arjmand violated section 301.4 every day since July 9, 2020, as well as an order that Arjmand maintain, clean, make safe, and secure the residence.

¶ 34    In count VII, the County alleged that, based on the graffiti on and in the residence, Arjmand violated section 302.9 of the Property Maintenance Code (property owner is responsible for restoring a defaced surface). The County indicated that from July 9, 2020, through at least October 6, 2020, the graffiti and defaced surfaces had not been restored. The County sought a finding that Arjmand violated section 302.9 every day since July 9, 2020, and an order that Arjmand restore the defaced surfaces.

¶ 35    In count VIII, the County alleged that the portico violated section 304.9 of the Property Maintenance Code (overhang extensions shall be kept in good repair and be properly anchored; exposed metal or wood surfaces shall be protected from the elements and decay). The County contended that, on July 9, 2020, and on multiple dates through at least September 10, 2020, the portico was in disrepair and was not protected from the elements. The County sought a finding that Arjmand violated section 304.9 each day since July 9, 2020, as well as an order that the portico be repaired or removed.

¶ 36    In count IX, the County alleged that the electrical system in the residence violated section 604.3 of the Property Maintenance Code (hazardous electrical systems shall be corrected or eliminated). Specifically, section 604.3.1.1 dictates that certain electrical equipment that has been

---

[1] Du Page County has adopted the 2015 International Property Maintenance Code by reference, with certain additions and deletions enumerated in section 8-900 of the County Code.

exposed to water shall be replaced. The County explained that from July 9, 2020, to at least October 6, 2020, the residence had open and exposed wires, loose hanging wires, open and uncapped junctions and outlets, electrical system exposure to the elements and submersion in water, and a deteriorated and damaged electrical system. Moreover, the County observed on October 6, 2020, that a sump pump was connected to the residence's electrical system by extension cords in the basement, and an electric box connected to the furnace had exposed wiring. The County sought a finding that Arjmand violated section 604.3 of the Property Maintenance Code every day since July 9, 2020, as well as an order to remove or repair the electrical system.

¶ 37      In count X, the County alleged that Arjmand violated sections 302.1 (exterior premises shall be kept in a clean, safe, and sanitary condition) and 308.1 (prohibiting accumulations of rubbish and garbage) of the Property Maintenance Code because the property was littered with garbage, rubbish, and various debris. The County requested a finding that these violations occurred every day since July 9, 2020, and an order that Arjmand clean the property.

¶ 38      In count XI, the County alleged that Arjmand violated section 304.2 of the Property Maintenance Code (requiring "plainly legible and visible" address numbers on buildings) from July 9, 2020, until at least October 6, 2020. The County requested a finding that Arjmand was in violation every day since July 9, 2020, as well as an order to install address numbers.

¶ 39      In count XII, the County alleged that Arjmand violated section 304.2 of the Property Maintenance Code (requiring that exterior surfaces be maintained in good condition and that wood surfaces be protected from the elements and decay by painting or protective coating). The County alleged that, on October 6, 2020, it observed that "the facia [*sic*] covering the roof rafters along parts of the exterior *** were missing, or never installed" and "interior wood components of the [residence]'s framing and, or roofing were exposed to the elements and decay." The County sought

15

a finding that Arjmand violated section 304.2 every day since July 9, 2020, as well as an order to repair the missing fascia.

¶ 40　　　In count XIII, the County alleged that Arjmand violated section 305.1 of the Property Maintenance Code (providing that the interior of a structure is to be kept "in good repair, structurally sound, and in a sanitary condition"). The County claimed that the violations included the deflecting floor on the second story; unsecured stairs, landings, balconies, and similar walking surfaces; openings in the floors either entirely unsecured or covered by unsecured sheets of plywood; mold and mildew on wood surfaces; and glass, lumber, trash, and construction debris on the floors. The County sought a finding that these violations occurred every day since July 9, 2020, as well as an order to remedy these conditions.

¶ 41　　　Finally, in count XIV, the County alleged that Arjmand violated sections 603.1 (providing that "mechanical appliances *** shall be properly installed and maintained in a safe working condition, and shall be capable of performing the intended function") and 605.1 ("[e]lectrical equipment, wiring and appliances shall be properly installed and maintained in a safe and approved manner") of the Property Maintenance Code. The County claimed that the sump pump and furnace were improperly wired and that the equipment in the basement had been submerged in water and could not be operated safely. The County sought a finding that these violations occurred each day since October 6, 2020, as well as an order that the conditions be remedied.

¶ 42　　　The County sought fines pursuant to section 8-117.4 of the County Code for counts I and V-XIV.

¶ 43　　　In response to the amended complaint, Arjmand denied that he had failed to "repair, correct, remedy, or remediate the conditions in the house." Specifically, Arjmand contended that the debris had been removed from the property. He did, however, admit that the residence was

16

missing an address number between July 9, 2020, and October 6, 2020, and that his building permit had expired and the residence was incomplete. Arjmand represented that he was unaware of missing fascia but admitted that portions of it were removed to conduct an inspection. Arjmand denied that the furnace was improperly wired and admitted that the sump pumps and furnace were connected to the electrical system, with the sump pumps being connected by extension cords. Arjmand admitted that water, at times, accumulated in the basement but stated that the defective sump pumps and furnace had since been replaced.

¶ 44 On December 4, 2020, the County filed a motion to modify the preliminary injunction. The County indicated that it had received Arjmand's portico report from a structural engineer, which was attached as an exhibit. The report noted that the portico's supporting columns had not been wrapped with stone or waterproofing and that they "observed localized step cracking in the stone at the bottom of both of the unwrapped columns which would suggest hidden damage behind the stone, most likely damage from water infiltration and subsequent freeze-thaw cycles." The report further noted "wide vertical cracking *** and wide gaps *** between the [portico] and the rest of the house." The engineer exposed select areas of the columns, one of which "showed significant deterioration and crushing of the wood column." The report concluded with the opinion that the portico was "no longer stable" and that the noted deterioration was "beyond repair/or reinforcement."

¶ 45 The County sought modification in the form of an order requiring Arjmand to brace and support the portico against collapse within seven days, and to barricade against individuals in the "collapse zone." The County requested permission to complete the work itself and be reimbursed for the same in the event Arjmand failed to act.

17

¶ 46     In response to the County's motion to modify, Arjmand confirmed that he had hired Lichtenberger Homes (LH) to repair the portico and that work began on December 10, 2020. However, the same day, the County issued the stop work order and stated that a permit was required. Arjmand stated that he directed LH to apply for the permit and complete the work as quickly as possible. At the January 6, 2021, status hearing, it was confirmed that the County had not yet received a permit application, although Arjmand's counsel could not identify the reason for the delay. The court granted the relief sought in the County's motion to modify.

¶ 47     At the January 28, 2021, status hearing, the County represented that LH had applied for a permit but that it was denied. Notwithstanding, the County conceded that, due to the County staff "dropping the ball," that (1) a County crew had not been dispatched to the property to work on the portico itself and (2) no one ensured that the denial was promptly mailed to Arjmand. Arjmand's counsel represented that he had since learned that LH had applied sufficient bracing to the portico, in compliance with the court's order, and that there was no work left for the County to do. The court requested clarification as to what work was completed on the portico and set the matter for an evidentiary hearing "regarding the structural safety/integrity of remedial work performed on the front portico." On February 11, 2021, the parties returned to court with an agreement that Arjmand had, in fact, braced the portico and that he would keep the bracing in place until he received a permit to permanently address the structural issues.

¶ 48     On April 21, 2021, the County filed a motion for summary judgment, arguing that none of the remedial measures served as permanent corrections of the dangerous conditions. The County indicated that Arjmand had obtained a building permit authorizing permanent repairs to the portico but that the remainder of the residence remained in hazardous disrepair. The County alleged that the facts underlying the violations were undisputed. Having set forth the unchanged condition of

18

the property, the County indicated that it had provided facts necessary to establish the violations. The County further argued that demolition or repair was warranted under section 5-1121 of the Counties Code. The County's "conclusion" read as follows:

"Defendant Arjmand should be ordered to promptly apply for a County permit to either: complete the work started more than a decade ago or demolish the Principal Structure. In the event these application submittals establish that the repair option cannot be reasonably accomplished, the Court may then amend its order to compel compliance via demolition only."

¶ 49    The County's motion for summary judgment included an affidavit of Hoss, which, *inter alia*, averred to the condition of the property and included photographs thereof. James Stran, manager of the Du Page County Building and Zoning Department, also provided an affidavit averring, *inter alia*, that the residence had not been inspected since December 2009 and that the last inspection passed was in October 2008. Cyrier also provided an affidavit, which, *inter alia*, set forth his observations of the property during his inspection on August 5, 2020. He further noted that he inspected the exterior of the residence on February 4, 2021, and February 10, 2021, and observed that the portico continued to pull away from the residence and that its support beams were deteriorating.

¶ 50    In response, Arjmand acknowledged that construction at the property had not been completed but stated that it was because he had been involved in "prolonged dissolution of marriage postjudgment proceedings[.]" He explained that both his marital and nonmarital assets had been restricted. He asked the court to consider the circumstances beyond his control when determining whether he should be obligated to immediately obtain a building permit and continue construction. Arjmand noted that he always contacted contractors promptly; installed a security

19

system and motion-activated flood lights (and there had been no trespassing since); securely capped all open interior and exterior wires; performed the work requested by the County; replaced all wooden columns in the basement; and provided lawn mowing and snow clearing services. Arjmand argued that the County's factual allegations about the status of the property were "out of date and d[id] not properly reflect the current status of the property and the work that has been performed by [Arjmand]." Thus, he continued, a genuine issue of material fact remained and precluded summary judgment. Arjmand provided an affidavit attesting to these facts and attached several invoices and contracts to evidence the work that he had completed.

¶ 51 On August 4, 2021, the court (Judge Gibson) heard the County's motion for summary judgment. At the outset of the hearing, the County summarized its prayer for relief as being the issuance of a $200,000 fine to be held in abeyance "and then lowered" if Arjmand was able to sell the property or obtain a building permit by February 2022. The County asked that, if Arjmand failed to do so, the County be permitted to demolish the property. Arjmand's counsel argued that the County's request for demolition was unreasonable and requested that Arjmand be granted time to complete the property given his financial difficulties. Arjmand's counsel further noted that the County's request for a $200,000 fine should not be granted because it did not appear in the prayer for relief in the motion for summary judgment.

¶ 52 The court granted the County's motion for summary judgment, explaining as follows:

"THE COURT: *** I agree with [Arjmand's counsel], that on some of the tangential matters, which I think are important in the big picture, that Mr. Arjmand hasn't been completely deficient in doing anything. He has done certain things to maintain or to combat some of the most flagrant safety issues. But the question—that doesn't change the fact that as to material facts.

20

Looking at—and I did go through every count, all 14 counts here, there is a big problem that you apply for building permits in 2007 and in 2012, and not have competed [*sic*] the work and have an expired building permit \*\*\*. \*\*\* *I do think the point is well taken that the motion for summary judgment didn't ask for a fine to be imposed today*.

\* \* \*

*And so I think that we should reserve that, the fine issue*, to see whether, in fact, there is a cure that's performed within the time period of February 28, 2022.

\* \* \*

Well, in any event, we're not going to enter a fine here today \*\*\*. *We'll have to review how many days at that point there has been noncompliance*, and what the appropriate daily amount would be for its noncompliance. So that will be reserved here today pending compliance with today's orders.

But this Court does find there's no issue of material fact relative to the bedrock facts that are important here. *There is* [*sic*] *some different takes* on exactly what has been done most recently in the past few years, but those aren't material facts relative to the relief sought. \*\*\* [T]here has been at least some items completed to abate the most egregious matters \*\*\*.

So in any event, *the motion for summary judgment will be granted*. \*\*\* [T]*he issue of fines will be reserved pending compliance with today's order*." (Emphases added.)

¶ 53     The written order stated, *inter alia*, that the "[c]ourt finds there is no issue of material fact in relation to the relief sought, as such [the County]'s motion for summary judgment is granted." The order provided for demolition or permitting by February 28, 2022, and that "an order for demolition of the subject property w[ould] be issued" in the event Arjmand failed to comply. The

21

order concluded that "[a]*ny issues regarding imposition of fines is reserved* to next court date pending compliance." (Emphasis added.)

¶ 54　　The parties returned to court (Judge Gibson) on March 2, 2022, for a status hearing, and Arjmand did not yet have a building permit. He explained that Arjmand attempted to submit an application but learned that his contractor's credentials with the County had expired, stalling the application process. He requested an additional seven days. The County stated that the boarded windows were no longer being maintained and asked that the demolition order be entered, along with fines for 570 days of violations. The written order provided that the residence was to be "immediately demolished," denied Arjmand's oral motion for an extension of time, and granted the County access to the property to inspect it ahead of demolition. The order provided that it was a final and appealable order, "with the Court reserving and retaining jurisdiction for determination of fines, fees, costs, and demolition expenses." The County was "granted leave to file an addendum and to recover fines, fees, costs, and demolition expenses, upon Court approval of estimated costs and the County incurs demolition costs."

¶ 55　　On April 1, 2022, Arjmand filed a motion to reconsider the March 2, 2022, order. Arjmand's motion explained that, as of January 31, 2022, the County implemented new permitting procedures, including an online system. Arjmand, his contractor, and a County employee each experienced technical difficulties during the application process, which the County employee was unable to resolve. Arjmand refuted any potential argument from the County that he should have initiated the application process sooner, again noting that his personal assets were tied up in his post-dissolution proceedings. Arjmand provided an affidavit attesting to these facts.

¶ 56　　On April 6, 2022, the County filed a motion for approval of estimated costs for demolition of subject property. The County outlined the work to be done and estimated that the cost of

demolition of the residence would be $138,085 and requested a finding that the sum was reasonable and appropriate.

¶ 57    The same day, the County filed an addendum of fines, fees, and costs. In it, the County argued that the court had granted summary judgment on all counts of the amended complaint and that the "only remaining matter" was for the court to determine the fines, fees, and costs. For counts I, V-X, and XII-XIV, the County sought a finding that Arjmand had violated the County Code for 632 days (July 9, 2020, to April 1, 2022). For count XI, the County sought a finding that Arjmand had violated the County Code for 217 days (July 9, 2020, to February 10, 2021). For these counts, the County requested that the fines be calculated at no less than $100 per day and no more than $1,000 per day pursuant to section 8-117.4 of the County Code. Attached to the addendum were photographs of the property dated April 1, 2022, contractor proposals and equipment estimates for the demolition project, and supporting affidavits. Hoss provided an affidavit outlining the bidding process for the demolition of the residence, as well as the steps taken to prepare for the demolition. Dwane Kozak, the wastewater manager for the Du Page County Public Works Department, provided an affidavit regarding the estimated costs of demolition.

¶ 58    On April 13, 2022, the court addressed the pending motions. After hearing arguments on Arjmand's motion to reconsider, the court noted that Arjmand had substantial time to complete construction or sell the property and, nonetheless, waited until February to begin the permit application process. Referencing Arjmand's affidavit, the court noted that "his credibility is limited in this proceeding" and that he had no additional information regarding when he submitted the application. The court denied the motion to reconsider, reasoning that Arjmand waited until the 11th hour and failed to demonstrate diligence in complying with the August 4, 2021, order. The

23

court granted the County's motion for approval of estimated costs for demolition and set a briefing schedule for the County's addendum for fines, fees, and costs.

¶ 59 Arjmand appealed the March 2, 2022, demolition order and the April 13, 2022, order denying his motion to reconsider. *County of Du Page v. Arjmand*, No. 3-22-0159 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). This court entered a summary order dismissing the appeal for lack of jurisdiction, reasoning that the reservation of the issues of fines, fees, and costs demonstrated that outstanding claims remained. *Id.* We further noted that the March 2, 2022, order failed to include the required finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason for delaying appeal or enforcement of the order. *Id.*

¶ 60 In response to the County's addendum for fines, fees, and costs, Arjmand first argued, *inter alia*, that the starting point of July 9, 2020, was improper, as it was based upon the July 9, 2020, administrative order, which had been vacated. Second, Arjmand disagreed that the August 4, 2021, summary judgment order made any factual findings asserted by the County and, therefore, the court could not rely upon summary judgment to determine the duration of the violations when calculating fines. Third, Arjmand argued that the County failed to present evidence of the costs and fees associated with its demolition of the property. Fourth, Arjmand challenged the County's position that the portico was unsafe, the residence was open and accessible, and that the electrical system was hazardous for the entire 632 days claimed, as Arjmand provided evidence of the steps taken to remedy these issues.

¶ 61 In reply, the County clarified that demolition was completed on June 9, 2022, and only at that point were all violations remedied. The County also argued that its motion for summary judgment, which set forth the numerous violations and their duration, could have only been granted

24

in the County's favor if the court had found that there were no genuine issues of material fact as to any count.

¶ 62 Thereafter, Arjmand was granted leave to file a supplemental response to the County's addendum for fines, fees, and costs. Arjmand argued that the County's addendum regarding fines for count I relied upon Hoss's affidavit to support its claims; however, Hoss's affidavit only discussed his observations during inspections from May 2017 to July 2020 and did not capture the full period of violations claimed by the County. Arjmand further contended that Cyrier's affidavit failed to support the County's position, as it conceded that all doors and windows had been secured at some point. Moreover, Cyrier's inspection occurred before Arjmand finished securing the property and remedied the issues with the portico. As for the fines related to count VI, Arjmand admitted that the property was vacant but disputed that the property was unsafe after he performed remedial work. For count VII, Arjmand argued that Hoss's affidavit was unclear regarding the content and location of the graffiti he observed. For count IX, Arjmand argued that the incompletion of the electrical system did not warrant the conclusion that it was dangerous and unsafe. For count X, Arjmand argued that the County failed to provide the dates on which it observed garbage and debris, noting that he had paid contractors to remove it from the property. For count XII, Arjmand argued that the County sought fines twice for the same conditions related to the exterior of the residence. For count XIII, Arjmand argued that the interior voids in the residence were previously secured and that the County did not provide evidence to support its conclusion that the second story floor was not capable of handling nominal loads. Finally, for count XIV, Arjmand argued that the mechanical and electrical equipment at the property were not improperly wired for the entire duration alleged by the County, as he eventually remedied the

issues. Arjmand ultimately requested that these contested issues of fact be set for evidentiary hearing before calculating fines.

¶ 63    In its sur-reply, the County indicated, *inter alia*, that Arjmand had not requested that the County inspect the portico after the alleged work was completed to fix it. Arjmand countered this assertion with his contractor's affidavit, averring that the County issued a final approval of the work that was performed on the portico. Attached was a copy of an inspection form signed by David C. and dated May 25, 2021. A box labeled "approved" was marked, and the form noted the inspection type as "Rough Frame & FINAL" and indicated in the comments, "R/R PIERS & Columns @ Porte Cochere."

¶ 64    On October 25, 2022, the matter came before Judge Chapman, who held a discussion with the parties' counsel to identify the pending issues and clarify the parties' respective positions. The court questioned the County's arguments and stated that it would be "particularly challenging" to determine the duration of the violations on the briefs. The court characterized the summary judgment proceedings as "almost summary judgment as to liability; but then there's this damages piece for purposes of fines in which there may need to be evidence." The court observed that summary judgment could have been entered on the fact that the violations existed on August 4, 2021, but that the record did not establish that the court found those violations existed on *all* of the dates maintained by the County. The court noted that damages are often a "fact-intensive inquiry."

¶ 65    The County compared Arjmand's remedial work to "Band-Aids on gaping bullet wounds" that failed to abate the underlying violations. The court (Judge Chapman) indicated that it needed to determine whether the court (Judge Gibson) took a position as to the duration of the violations when it granted summary judgment. Following a discussion in chambers, the parties agreed to engage in settlement negotiations and return for a status hearing.

26

¶ 66 On May 8, 2023, following several months of settlement negotiations, the County filed a final motion for assessment of fees, fines, and costs. Therein, the County sought the calculation of fines as the number of daily violations present from July 9, 2020, to April 1, 2022. On count II, the County sought reimbursement in the amount of $101,187.39 for its final demolition costs. Supporting invoices were attached. Also attached were photographs of the property and residence. In February 23, 2022, photograph taken by Hoss, at least four unsecured windows were visible. Photographs dated April 1, 2022, showed letters, words, and images drawn in paint on what appears to be the interior of the residence. Several additional images were attached. Arjmand's response to this motion did not set forth any new arguments, again contending, *inter alia*, that there were genuine issues of material fact that precluded summary judgment and that an evidentiary hearing was necessary to determine the extent of the violations.

¶ 67 On August 14, 2023, the court entered an order for ruling on "the scope of issues to be considered at a prospective evidentiary hearing on [the County]'s Final Motion for Assessment of Fines, Fees and Costs, as well as setting of said hearing." The parties were ordered to file supplemental briefing. The County argued that the scope of the evidentiary hearing should be "limited to the determination of fines for violations existing *subsequent* to entry of Summary Judgment and/or the Court's March 2, 2022, Demolition Order." (Emphasis added.) The County stated that expanding upon this scope would raise the issue of potentially inconsistent rulings when viewed in conjunction with the August 4, 2021, order. On the other hand, Arjmand argued that "a fair reading of the transcript of the [summary judgment] proceeding reveals that Judge Gibson want[ed] to determine what actions [Arjmand] would take with respect to obtaining a permit before he made any further rulings in this matter as to specific violations or fines to be imposed." He

27

requested that the period *prior to* the summary judgment proceedings be included within the scope of an evidentiary hearing.

¶ 68    On September 19, 2023, the parties appeared before the court (Judge Chapman) to further discuss the scope of the hearing. When considering the entry of the August 4, 2021, summary judgment order, the court described Arjmand's argument that some of the violations had been remedied as of that date as "problematic." Acknowledging the comments made by the court (Judge Gibson) when ruling on the motion for summary judgment, the court (Judge Chapman) explained that it did not "strike this Court [Judge Chapman] as saying anything other than certain aspects have been addressed but the underlying ordinance violations which form the basis for the complaint *** were still in existence at that time." In response, Arjmand's counsel noted Judge Gibson's statement that he was looking at the motion for summary judgment *with respect to the relief sought in the motion for summary judgment* (permit or demolition). The County countered that Judge Gibson was referencing the *relief sought in the amended complaint*, not the motion for summary judgment, and that every count of the complaint requested a finding that Arjmand violated the County Code. The court denied Arjmand's request for an evidentiary hearing, concluding that "the summary judgment on all 14 counts finds, as a matter of law, that there are no genuine issues of material fact between July 9, 2020, and August 4, 2021."

¶ 69    However, the following day, on September 20, 2023, Judge Chapman ordered counsel to reappear, at which point the court explained that the August 4, 2021, order established the existence of violations through August 4, 2021, but that an evidentiary showing *was* necessary to establish the existence of any violations from August 4, 2021, to February 28, 2022 (the deadline for Arjmand to sell the property or obtain a permit).

¶ 70        The court further noted that count I of the complaint *did not* allege daily violations from July 9, 2020, on, while counts V-XIV *did* make that allegation. Thus, the court concluded that, based on the summary judgment order, Judge Gibson concluded that violations existed at all times since July 9, 2020, for counts V-XIV, but that the dates of the violations contained in count I were limited to the select dates identified in count I. Accordingly, Arjmand was granted time to file a response or counter-affidavit to Hoss's "pre-demolition Affidavit(s)." The order also set forth the court's finding that "for the Ordinance Violations listed in Count I of the Amended Complaint, fines shall be limited to the dates listed/alleged within that Count" and that "Counts II, III and IV of the Amended Complaint do not request the imposition of fines."

¶ 71        On October 11, 2023, Arjmand filed an affidavit averring that, on September 24, 2020,[2] he contracted with ADT to provide security services at the property, including, *inter alia*, "window and door contacts, glass break detectors, motion detectors, indoor and outdoor sirens, outdoor strobe light, and smoke detectors," as well as "monitoring of the property to ensure a response in the event that any of these detectors were tripped or activated." He stated that these systems, along with the security fence, were in place from the date summary judgment was entered until the County commenced demolition. During this time, he did not receive any notifications of break-ins. Arjmand further averred that, prior to the entry of summary judgment, he secured the windows and doors at the residence and had not received any indication that they had been breached or compromised. Attached to the affidavit was documentation for the security equipment, alarm registration, alarm services contract, installation, and monitoring.

¶ 72        On October 17, 2023, the County filed a supplemental affidavit for Hoss. Hoss averred that he "conducted visits to and code enforcement inspections of" the property on July 10, 2020, July

---

[2] The affidavit states September 24, 2000, but this appears to be a scrivener's error. The record suggests that the correct date is September 24, 2020.

11, 2020, July 15, 2020, July 23, 2020, July 24, 2020, July 25, 2020, August 1, 2020, August 3, 2020, August 4, 2020, August 11, 2020, August 14, 2020, February 22, 2022, March 15, 2022, and April 1, 2022. Hoss indicated that in the fall of 2020, "all of the windows and doors were reboarded, standing water in the basement was pumped out, a security fence was erected around the [residence]'s perimeter, and a security system was installed." Hoss averred that, with the exception of the portico permit, Arjmand lacked a valid permit at all times since 2012. Hoss, again, set forth his observations at the property between May 2017 and July 2020. On the dates of his inspections and/or visits to the property, the previously described conditions of the residence and property continued to exist as of April 1, 2022. He specifically observed as of April 1, 2022,

> "Arjmand had not repaired or replaced those elements of the [residence] that had been damaged ***. This includes but is not limited to: rotting wood in the soffits and the rotting front portico support beams ***; mold and mildew covered walls in the basement; water-damaged electrical and HVAC equipment in the basement; mold on the building's exterior walls; mold and mildew around several interior window openings; framework covered with bird droppings; new graffiti (interior and exterior) ***; areas of the floor on the 2nd story deflected and bounced when walked upon; cracked exterior surfaces; broken windows, doors, and windows/door board ups; broken skylights; exposed wiring and electrical components pulled from the walls; no fire alarms, smoke detectors, emergency lighting, or fire suppression measures; unsecured bridges across second floor openings; 2nd and 3rd story floors without any barricades, guards, safety features, or warning devices to protect occupants from falling over ledges or through holes in the flooring; *** 'builders ladders' ***; etc. ***. So too, while the front portico had been temporarily braced as of April 1, 2022, the wooden bracing blocks were exposed to the elements and were altogether

30

insufficient to render the portico permanently safe. The portico's support beams had continued to deteriorate, and the portico was still pulling away from the [residence]." Hoss noted that, as of April 1, 2022, there was still garbage and construction debris throughout the residence and property, as well as broken glass, metal, and wood scraps. Hoss denied that Arjmand's efforts at securing the residence were sufficient, noting that, on February 23, 2022, March 25, 2022, and April 1, 2022, break-ins were evidenced by broken boards and new graffiti in the residence. Attached to the exhibit were several photographs depicting the condition of the residence, at least some of which had been attached as exhibits to prior pleadings.

¶ 73    The matter was scheduled for setting of the hearing on the County's motion for final assessment of fees, fines, and costs before Judge Gibson on December 13, 2023. On December 12, 2023, Arjmand filed a motion for recusal pursuant to Illinois Supreme Court Rule 63(c) (repealed Jan. 1, 2023). This rule is now located at Rule 2.11 of the Illinois Code of Judicial Conduct. Ill. Code Jud. Conduct (2023), Canon 2, Rule 2.11 (eff. Jan. 1, 2023). Arjmand argued that the court's (Judge Gibson's) "impartiality was manifest" during the hearing on Arjmand's motion to reconsider the demolition order. Specifically, Judge Gibson, without hearing testimony, concluded that Arjmand's "credibility is limited in this proceeding" when discussing Arjmand's affidavit. Arjmand contended that this was an extrajudicial opinion without support in the record, thereby giving the appearance of impropriety that required Judge Gibson to recuse himself. On January 9, 2024, the court heard Arjmand's motion for recusal. Noting that substitutions of judges in civil cases are governed solely by statute, the court evaluated the motion as a motion for substitution for cause. The motion was denied. Arjmand filed a motion to reconsider, which was also denied.

¶ 74    On January 9, 2024, Arjmand filed a motion to reconsider entry of summary judgment, arguing that the pleadings with respect to the County's motion for summary judgment revealed

31

that "questions of fact existed with respect to whether all of the violations existed on all of the days alleged by [the County]." The court denied the motion, noting that it was untimely and "essentially a motion to try to start over."

¶ 75 On February 9, 2024, the court (Judge Gibson) ruled on the County's motion for final assessment of fines, fees, and costs. In its oral ruling, the court noted that the County sought the remedial costs of demolition in counts II, III, and IV of the amended complaint and found that the County's claimed cost of $101,187 was appropriate. The court awarded this amount as damages with respect to count II and did not award damages for counts III and IV. The court indicated that it was inclined to impose "the low end" of the daily fines and calculated them at $100 for 612 days for counts I and V-XIV, recognizing that Arjmand "did not completely ignore remedial measures, although he failed to ultimately remediate the issues that were raised." In sum, the court granted the County fines in the amount of $673,200 and $101,187 in remediation and demolition costs ($774,387 total).

¶ 76 On March 11, 2024, Arjmand filed a motion to reconsider the final judgment. First, Arjmand again argued that, given his remedial work at the property, genuine issues of material fact existed with respect to every count aside from counts V (no valid building permit) and XI (no address marker) and that the court erred in granting summary judgment on all counts of the amended complaint. Second, Arjmand argued that the court failed to make the necessary findings before entering the demolition order, therefore mandating its vacation. Citing *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 131 (2004), he contended that the court was required to find that the building was dangerous and unsafe and that it was beyond reasonable repair. Finally, Arjmand argued that the court's erred in its imposition of fines "in the face of contradictory evidence." With respect to count I, Arjmand noted that the computation of fines at 612 days violated the court's

32

September 20, 2023, order that fines for count I "would be limited to the dates listed/alleged within that Count." Count I only identified 10 days. With respect to count VII, Arjmand argued that the County failed to demonstrate that the graffiti was visible to a member of the general public, as required to be found in violation of the County Code. With respect to count VIII, Arjmand indicated that he had obtained a permit to repair the portico, completed the work, and received a final approval of the work from the County on May 25, 2021, and thus could not have been in violation for the entire 612 days. With respect to count X, Arjmand argued that the County acknowledged on September 10, 2020, that Arjmand had cleared the property of debris and that Hoss had not visited the property between August 14, 2020, and February 22, 2022. The motion was denied.

¶ 77        Arjmand timely appealed.

¶ 78                                    II. ANALYSIS

¶ 79        On appeal, Arjmand sets forth four arguments. First, Arjmand challenges the demolition order as lacking the requisite findings and being entered without jurisdiction due to the ongoing post-dissolution proceedings and Rahman's potential interest in the property. Second, Arjmand argues that the court erred in granting the County's motion for summary judgment because Arjmand's response raised genuine issues of material fact with respect to the extent of the violations following Arjmand's remedial work. Third, Arjmand disputes the court's imposition of fines on counts I, VII, VIII, and X. Fourth, Arjmand contends that Judge Gibson erred in failing to recuse himself following his commentary regarding Arjmand's credibility.

¶ 80        Pursuant to section 2-1005(a) of the Code of Civil Procedure (735 ILCS 5/2-1005(a) (West 2020)), "a plaintiff may move with or without supporting affidavits for a summary judgment in his or her favor for all or any part of the relief sought." Summary judgment is appropriate where "the

33

pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* § 2-1005(c). The court must consider the entire record when determining whether there exists a genuine issue of material fact. *Hoel v. Crum & Forster Insurance Co.*, 51 Ill. App. 3d 624, 632 (1977). We review summary judgment *de novo*. *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 84 (1996). We may affirm summary judgment on any grounds supported by the record. *City of Chicago v. Michigan Beach Housing Cooperative*, 297 Ill. App. 3d 317, 327 (1998).

¶ 81                                    A. Demolition Order

¶ 82        We begin with the propriety of the court's March 2, 2022, demolition order, which stemmed from its August 4, 2021, entry of summary judgment. Arjmand first argues that two specific findings are required before a court may order the demolition of a property pursuant to section 5-1121 of the Counties Code (55 ILCS 5/5-1121 (West 2020)) ("The county board *** may demolish, repair, or enclose *** dangerous and unsafe buildings or uncompleted and abandoned buildings"). First, the court must find that the building is dangerous and unsafe. *City of Aurora v. Meyer*, 38 Ill. 2d 131, 137 (1967); *Stokovich*, 211 Ill. 2d 106, 131 (2004).[3] Second, the court must find that the building is beyond reasonable repair, which must be based on the cost of repair compared to the value of the building. *Meyer*, 38 Ill. 2d at 137; *Stokovich*, 211 Ill. 2d at 131. If the specific defects that render the building dangerous and unsafe "may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs." *Meyer*, 38 Ill. 2d at 137. Because the court failed to make these findings when

---

[3] *Meyer* and *Stokovich* interpret section 11-31-1 of the Illinois Municipal Code (65 ILCS 5/11-31-1), which contains analogous language to section 5-1121 of the Counties Code. As such, cases discussing section 11-31-1 are instructive when interpreting section 5-1121 of the Counties Code. See *County of McHenry v. Smith*, 2015 IL App (2d) 141165, ¶ 17.

ordering demolition pursuant to count II of the amended complaint and the record did not contain any evidence regarding the cost of repairs or the value of the building, Armand contends, the demolition order must be vacated.

¶ 83        Initially, the County responds that Arjmand forfeited this argument by not raising it before the trial court. Arjmand disagrees, though we note that Arjmand raised the argument for the first time in his March 11, 2024, motion to reconsider the final judgment. However, we need not determine whether this constitutes a forfeiture because the argument fails on its merits. While we acknowledge that the demolition order lacks the specific findings contemplated in *Meyer*, we may nevertheless affirm if the record contains sufficient support for the entry of the demolition order. See *Michigan Beach Housing Cooperative*, 297 Ill. App. 3d at 327.

¶ 84        Considering whether there existed a genuine issue of material fact with respect to the dangerous and unsafe nature of the property, we note that this determination "must be made without regard to *** temporary protective measures" put in place by Arjmand to prevent access to the residence. 55 ILCS 5/5-1121 (West 2020) ("It is not a defense to the cause of action that the building is boarded up or otherwise enclosed."); *City of Alton v. Carroll*, 109 Ill. App. 3d 156, 161 (1982). It is undisputed that, with the exception of the permit to repair the portico, Arjmand was without a permit to engage in construction on the property since 2012. It is also undisputed that construction of the residence was incomplete, and it was uninhabitable. Thus, there is no question that, aside from the portico repairs, the residence stood vacant without progress towards its completion for approximately 10 years between the expiration of the building permit and the entry of the demolition order. The record further demonstrates that, over the years, the residence gained notoriety and was regularly broken into by both adults and juveniles, resulting in the board-ups regularly being removed. In addition to the extended incompletion of the residence, numerous

35

dangerous and unsafe conditions were undisputed as existing within the residence and on the surrounding property. These include mold and mildew around several interior windows, basement walls, and exterior walls; missing fascia covering roof rafters; bridges of unsecured lumber covering gaps in the floor, soot and smoke damage within the residence from at least one fire set by trespassers; and interior staircases or ledges without railings. The record contains sufficient support for a conclusion that there was no genuine issue of material fact as to whether the residence was dangerous and unsafe.

¶ 85　　　　Turning to the second requirement, that the residence be beyond reasonable repair, our supreme court has determined that the language of the statute, "in providing for repair or demolition in the alternative, contemplates repair where feasible and demolition where the state of deterioration is such that repairs would amount to a substantial reconstruction." *Meyer*, 38 Ill. 2d at 136. With this understanding in mind, the court further held that if the specific defects that render the building dangerous and unsafe "may readily be remedied by repair, *demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs.*" (Emphasis added.) *Id.* at 137. From this language it follows that, even where the dangerous and unsafe conditions could reasonably be repaired, demolition might nevertheless be ordered where the property owner fails to take advantage of "a reasonable opportunity to make the repairs." *Id.*

¶ 86　　　　As to the propriety of a demolition order after a reasonable opportunity to repair has long passed, we find instructive *Village of Gurnee v. Miller*, 25 Ill. App. 3d 915 (1975). In *Miller*, the defendants owned a building that stood vacant for more than three years. *Id.* The municipality filed a complaint seeking demolition based on the building's dangerous and deteriorated condition. *Id.* at 916. The defendants were granted several continuances and orders extending their time to make

36

repairs. *Id.* at 915-16. Four years later, and without any repairs having been made and the building remaining vacant, a demolition order was entered. *Id.* at 916. The defendants appealed. *Id.*

¶ 87    On appeal, the court interpreted *Meyer's* holding that demolition can only be ordered where a building cannot be repaired without major reconstruction to mean that demolition cannot be ordered "without giving the owners a reasonable opportunity to make the repairs." *Id.* (quoting *Meyer*, 38 Ill. 2d at 137). The court noted that, while the building was perhaps repairable, repairs were not made "even after the many continuances ***." *Miller*, 25 Ill. App. 3d at 916. Because more than four years had passed between the filing of the complaint and the entry of the demolition order, the court concluded that the municipality had "extended every opportunity to the owners to repair the premises or make them habitable ***." *Id.* at 917. Acknowledging that courts should be cautious in ordering demolition, the court observed that defendants, without excuse, allowed the building to remain vacant and accessible the entire time. *Id.* Considering the "generous opportunity afforded defendants" to remedy the issues, the court affirmed the demolition order, explaining that it was justified as a matter of "absolute necessity" due to the hazardous conditions present. *Id.*

¶ 88    We are presented with similarly unique circumstances here. Given that construction began in 2007, the building permit expired in 2012, this action commenced in 2020, summary judgment was entered in 2021, and the demolition order was not entered until 2022 (after Arjmand was granted an *additional* six months to obtain a permit), there is no doubt that Arjmand had more than a reasonable opportunity to repair the residence.

¶ 89    Even accepting for the sake of analysis that the property could have been reasonably repaired, Arjmand failed to do so despite the "generous opportunit[ies]" afforded to repair the residence. It remains unclear what more the court could have done to procure repairs in this instance. See *City of Granite City v. House of Prayers, Inc.*, 333 Ill. App. 3d 452, 460 (2002)

37

(defendant had a reasonable opportunity to repair where two years had elapsed between the filing of the complaint seeking demolition and the entry of the demolition order). Considering that the residence continued to be notorious within the community and broken into, even after Arjmand implemented temporary security measures, demolition was ordered as a matter of "absolute necessity" to protect the public. *Miller*, 25 Ill. App. 3d at 917. For these reasons, we conclude that there was no genuine issue of material fact as to whether the residence was beyond reasonable repair. Accordingly, we affirm summary judgment with respect to count II of the amended complaint. We also affirm summary judgment on counts III and IV, recognizing that demolition and the costs thereof were also appropriate under these counts for similar reasons and that the court did not award duplicative damages.

¶ 90        Finally, Arjmand argues that the court lacked jurisdiction to order the demolition of the residence because the residence was purchased during his marriage and was a subject of his post-dissolution proceedings. Therefore, Arjmand continues, Rahman has a potential interest in the property. Generally, where two actions are brought in different courts but are "between the same parties, on the same subject and to test the same rights," the court that acquires jurisdiction first "may dispose of the entire matter and no coordinate court is at liberty to interfere with its action." *City of Chicago v. General Realty Corp.*, 133 Ill. App. 2d 662, 669 (1971). However, post-dissolution proceedings and code enforcement or demolition proceedings do not test the same rights and are therefore not subject to this rule. The post-dissolution proceedings are between private individuals, while this matter was commenced by the County to protect the public. "It cannot be maintained that the C[ounty] is powerless to protect the people while private parties are settling their financial affairs." *Id.*

¶ 91                                    B. Summary Judgment and Fines

38

¶ 92        Arjmand next challenges the court's grant of summary judgment generally, arguing that genuine issues of material fact existed with respect to the extent of the violations. Arjmand notes the remedial work he completed and contends that the court erred when it focused solely on his failure to obtain a building permit in concluding there were no genuine issues of material fact.

¶ 93        We first turn to the propriety of summary judgment on counts I and V-XIV, as we affirmed summary judgment on counts II-IV *supra*. On appeal, both parties accept Judge Chapman's interpretation of Judge Gibson's August 4, 2021, order—that the order constituted a finding that the alleged violations existed every day alleged in the amended complaint. While Arjmand argues generally that his response to the County's motion for summary judgment raised genuine issues of material fact, he identifies potential questions of fact that implicate only select counts of the amended complaint. Specifically, he notes that he secured the windows and doors on the property, installed a fence and security system, drained water from the basement, installed sump pumps, capped all open electrical wires, and replaced wooden columns in the basement. He also quotes the court's acknowledgment of certain work he performed at the property. In a separate argument regarding the imposition of fines, which will be discussed in further detail *infra*, Arjmand argues that there was no evidence that the graffiti on the residence was visible to a member of the general public, he repaired the portico and received final approval of the work from the County, and the County acknowledged during the litigation that the garbage on the property had been removed.

¶ 94        In comparing these contentions to the complaint, the counts that are implicated in this argument on appeal are I (unsafe structure), VI, (vacant structures to be maintained in a clean, safe, secure, and sanitary condition), VII (graffiti), VIII (portico), IX (electrical system hazards), X (exterior sanitation), and XIV (mechanical and electrical equipment). Arjmand did not develop arguments related to counts V, XI, XII, and XIII, and we therefore affirm summary judgment as

39

to liability on these counts. Based on the procedural history of this case and the issues raised on appeal, we review summary judgment on the remaining counts I, VI, VII, VIII, IX, X, and XIV for the issue of liability only (meaning a violation existed on at least one day alleged by the County) and address the court's imposition of fines/damages separately. See *DiCosola v. Ryan*, 2015 IL App (1st) 150007, ¶ 8 (we may affirm on any grounds supported by the record).

¶ 95     For the same reasons we affirmed summary judgment on counts II-IV, *supra* ¶ 84, we affirm summary judgment as to liability on counts I and VI. Count I alleged a violation of section 8-120.1, which requires unsafe buildings or structures to be removed or made safe. "Unsafe structures" is defined as "[a]ny building or structure which constitutes a fire hazard, or is in danger of collapse, explosion, or otherwise threatens the public health, safety or welfare, or which has become deficient in adequate exist facilities, or which involves an illegal or improper use, occupancy or maintenance, or any vacant building or structure unguarded, unsecured, or open and accessible to the public at door or window." Count VI alleged a violation of section 301.4 of the Property Maintenance Code, which requires that vacant structures and premises be "maintained in a clean, safe, secure, and sanitary condition *** so as to not cause a blighting problem or adversely affect the public health or safety." Even accepting as true that Arjmand completed all of the work he claims, he does not dispute the existence of several other significant health and safety issues that were alleged by the County. There is no genuine issue of material fact as to whether the residence was an unsafe structure that posed a danger to the public.

¶ 96     In count VII, the County alleged a violation of section 302.9 of the Property Maintenance Code, which provides that a property owner is responsible for restoring defaced surfaces on the property. Section 202 defines "graffiti" as follows:

40

"In addition to its usual and customary meaning of defacing walls or structures with messages or slogans, 'graffiti' shall also mean any letter, numeral, figure, *** or representation *wherein the contents thereof are visible to any member of the general public* and which contains references to sexual activity, *** references to criminal activities ***, swearing or fighting words, references to relationships or any marking of any kind whatsoever which results in damage to, defacing of, marring of, or discoloring of any *** interior/exterior surface of a wall, fence, door, building, or other structure." (Emphasis added.)

¶ 97 The record supports the conclusion that the graffiti was, in fact, visible to the public. The County produced numerous photographs showing graffiti painted on the exterior of several doors, walls, and boards, as well as on a garage door. Moreover, Mikula averred in his September 2, 2020, affidavit that he, as a neighboring resident, could see graffiti on the exterior of the residence. Arjmand has never raised a genuine issue of material fact by denying that this graffiti existed, alleging that it was not visible to any member of the public, or claiming that these surfaces were restored. Without any indication that the graffiti was *not* visible to the public or was otherwise remedied, we cannot conclude that there existed a genuine issue of material fact as to whether it violated sections 202 and 302.9. See *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14 ("However, summary judgment requires the responding party to come forward with the evidence that it has—it is the put up or shut up moment in a lawsuit." (Internal quotation marks omitted.)) We affirm summary judgment as to Arjmand's liability on count VII.

¶ 98 In count VIII, the County alleged a violation of section 304.9 of the Property Maintenance Code, which provides that overhang extensions are to be kept in good repair and be properly anchored. Additionally, all exposed metal or wood is to be protected from the elements. Although

41

the parties disagree as to duration of the portico's violation of this section, it is undisputed that it was not in good repair or in sound condition on at least one of the days alleged by the County. Indeed, Arjmand obtained a report from a structural engineer to this effect and subsequently hired a contractor to remedy the issues. The County's allegations were also supported by photographs. Therefore, we affirm summary judgment as to Arjmand's liability on count VIII.

¶ 99 In count IX, the County alleged a violation of section 604.3 of the Property Maintenance Code, which provides, "Where it is found that the electrical system *** constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient receptable and lighting outlets, improper wiring or installation, deterioration or damage, or similar reasons, the code official shall require the defects to be corrected to eliminate the hazard." Furthermore, section 604.3.1.1 requires that electrical equipment that has been exposed to water be replaced rather than repaired. While Arjmand argues that he capped all electrical wires in the residence, drained the water from the basement, and replaced the furnace and sump pumps, these facts fail to raise a genuine issue of material fact. Arjmand does not dispute that the basement was filled with water, or that the interior of the residence and therefore the residence's electrical system were exposed to the elements. Arjmand does not allege that anything other than the furnace and sump pumps were replaced, and thus the electrical system thus remained a hazard and a violation. Summary judgment as to Arjmand's liability for count IX was appropriate.

¶ 100 In count X, the County alleged a violation of sections 302.1 and 308.1 of the Property Maintenance Code. Section 302.1 requires that exterior property be kept "in a clean, safe, and sanitary condition ***." Section 308.1 prohibits the accumulation of "rubbish and garbage." The parties again disagree as to the duration of this violation, but it is undisputed that debris was present at some point during the time period alleged by the County. The record contains photographs of

42

debris in the lawn and around the perimeter of the residence, Mikula's affidavit avers that he saw broken glass on the property, and Arjmand acknowledged that a small amount of debris was present and that he hired professionals to clean the property. We affirm summary judgment as to Arjmand's liability on count X.

¶ 101    Finally, in count XIV, the County alleged a violation of sections 603.1 and 605.1 of the Property Maintenance Code. Section 603.1 provides that mechanical appliances are to be properly installed, maintained in a safe working condition, and able to perform their intended function. Section 605.1 provides that electrical equipment is to be properly installed and kept in a safe and improved manner. The County alleged that the sump pump and furnace were improperly wired and that electrical systems in the basement had been submerged under water for an unknown period of time and could not be operated safely. As noted in our discussion of count IX, Arjmand did not claim to have replaced electrical equipment apart from the sump pumps and furnace and, therefore, it was not maintained in a safe and approved manner. We affirm summary judgment on Arjmand's liability for count XIV.

¶ 102    In turning to the issue of fines, we first address the fines that were imposed for violations that occurred *after* entry of summary judgment on August 4, 2021. While neither party specifically raised the propriety of imposing post-judgment fines, we determined it was necessary to do so to ensure a just and accurate result. *People v. Givens*, 237 Ill. 2d 311, 325 (2010) ("[A] reviewing court does not lack authority to address unbriefed issues and may do so in the appropriate case, *i.e.*, when a clear and obvious error exists in the trial court proceedings."). Accordingly, we ordered supplemental briefing on this issue to assist in our analysis. A court's imposition of a fine is reviewed for an abuse of discretion. *Village of Barrington Hills v. Life Changers International Church*, 354 Ill. App. 3d 415, 420 (2004).

¶ 103     In *County of Kendall v. Rosenwinkel*, 353 Ill. App. 3d 529, 533 (2004), *overruled on other grounds by City of Rock Falls v. Aims Industrial Services, LLC*, 2024 IL 129164, the plaintiff alleged that the location of defendant's grain bin violated a setback zoning ordinance. Following a trial, the trial court found that the defendants violated the ordinance and continued the matter for argument on the fines to be imposed. *Id.* at 537. Approximately one month later, the trial court imposed fines for $500 per week, commencing on the date the complaint was filed and "continuing to accrue until the grain bin is removed from the[s]ubject [p]roperty." *Id.* at 538. The defendants appealed. *Id.*

¶ 104     The appellate court affirmed the imposition of fines for each week the County proved the existence of the violation *up until the date trial proofs were closed*. *Id.* at 548. However, the fines imposed for violations *after* the close of trial proofs were reversed because they had not been proven and the trial court was not authorized to impose an ongoing fine pending defendants' compliance. *Id.* The court held that the fine order "penalize[d] defendants for ordinance violations that ha[d] not yet occurred and ha[d] not been pleaded or proven by the County, without affording defendants a trial." *Id.* at 549. In support of its conclusion, the court quoted *Kansas v. Scherer*, 11 Kan. App. 2d 362 (1986), which also involved the prosecution of an ordinance violation. *Scherer* held that, because evidence of a post-trial violation could not have been properly offered during the trial, the defendant could not be punished for violations alleged to have occurred post-trial until he was convicted of the same. *Id.* at 369.

¶ 105     Here, the County has repeatedly taken the position that it received a judgment following the hearing on August 4, 2021, a position that Judge Chapman and Judge Gibson ultimately agreed with. As *Rosenwinkel* explains, fines can be imposed only through the close of evidence. See *Rosenwinkel*, 353 Ill. App. 3d at 548. The August 4, 2021, judgment served as the basis for the

44

imposition of fines, despite their calculation being reserved pending the sale or permitting of the property; therefore, fines must be calculated for violations proven up the date of summary judgment, *but not after judgment*. Because potential future violations cannot be punished, the County did not (and could not) prove at the time of summary judgment that post-judgment violations were a suitable basis for fines. See *id.* at 549. The County elected to proceed and prevailed on its motion for summary judgment and, as such, the court was not authorized to impose a continuing fine after the entry of summary judgment. We reverse all fines imposed on counts I and V-XIV for violations that were alleged to have occurred after the August 4, 2021, entry of summary judgment.

¶ 106    We next address the propriety of the pre-judgment fines. As to these, Arjmand specifically challenges the fines assessed for counts I, VII, VIII, and X.

¶ 107    Citing the September 20, 2023, order providing that any calculation of fines with respect to count I should not exceed the 10 days identified in the amended complaint, Arjmand argues that the court erred when it later imposed fines for 612 days for count I. The County argues that Arjmand waived this argument by failing to raise it in a timely manner below and that the evidence supported the imposition of fines for 612 days. "Waiver is a limitation on the parties, not on the court, and a reviewing court may ignore waiver in order to achieve a just result." *In re Janet S.*, 305 Ill. App. 3d 318, 320 (1999). We agree that the calculation of fines for 612 days was an abuse of discretion, as it expands the potential scope of liability beyond the time frame set forth in the complaint and otherwise contradicts the September 20, 2023, order which was not otherwise modified. We reverse the fines imposed for count I and remand for a recalculation not to exceed 10 days or extend beyond August 4, 2021.

¶ 108        Arjmand next contends that the fines imposed as to count VII were not supported by the evidence because the County neither alleged nor proved that the graffiti was visible to a member of the general public. Thus, he concludes, any fines related to Count VII must be vacated. However, as discussed above, *supra* ¶ 97, the record supports the conclusion that the graffiti was visible to the public. Arjmand does not deny that the markings on the residence existed as alleged by the County or that the initial graffiti that Hoss observed was not removed. We note that the record does contain photographs of an individual painting over graffiti, as well as the fully removed graffiti, but those photographs were taken several years before the underlying litigation commenced and were part of the record in Arjmand's divorce proceeding. Therefore, we affirm the court's imposition of fines on count VII through August 4, 2021.

¶ 109        Arjmand further challenges the fines on count VIII, arguing that he began the process of coordinating the repair of the portico on September 4, 2020, when he hired an architect to perform an inspection, applied for and obtained a permit to perform the necessary work, and received a final approval for the work completed from the County on May 25, 2021. He contends that no fines should be imposed before August 7, 2020, as he learned of the portico issues along with the filing of the original complaint, or after September 4, 2020, when he began the repair process. The County counters that the work performed only addressed the bracing issues and did not permanently correct the residence's overall dangerousness or other violations.

¶ 110        Although the record supports the conclusion that the portico violated section 304.9 on at least one day alleged by the County, the record does *not* support the finding that it was in violation every day alleged. The amended complaint alleged that the portico was not in good repair, that it was not properly anchored, and that it was supported with wood columns that had been exposed to the elements. These concerns were confirmed by the structural engineer's report, and Arjmand

46

obtained a permit. The permit described the work to be completed as follows: "replace two concrete piers and attached wood columns with two new reinforced concrete piers and two new steel columns; resecure porte cochere framing to existing house framing—per plans." The County acknowledged in its final motion for the assessment of fees, fines, and costs that Arjmand's permit for the portico "authoriz[ed] him to perform permanent repairs" to it. Indeed, the County issued a final approval for the work completed on the portico on May 25, 2021, months before the summary judgment date.

¶ 111        From this it follows that the court's imposition of fines for the entire 612 days was an abuse of discretion. To the extent the County argues that the portico deteriorated again after May 25, 2021, warranting post-approval fines, it must prove the date on which the re-deterioration was discovered and its duration. See *Rosenwinkel*, 353 Ill. App. 3d at 549 (plaintiff carries the burden of proving each instance of an ordinance violation). Simply put, any date on which the portico was in compliance with section 304.9 must be excluded from the calculation of fines prior to the entry of summary judgment and the County carries the burden of establishing these dates. See *id.* at 549-50.

¶ 112        Arjmand also argues that he was unaware of the portico violations until the original complaint was filed on August 7, 2020, and that the court improperly began the imposition of fines on July 9, 2020. In response, the County claims that it only requested fines from August 7, 2020, to April 1, 2022, and that this was 632 days. However, there are only 602 days between those two dates, and the court imposed fines for 612 days. To further demonstrate the confusion regarding the appropriate starting point, contrary to the County's position on appeal, the County did, in fact, request that the calculation of fines for count VIII begin on July 9, 2020, in its amended complaint; motion for summary judgment; and final motion for assessment of fees, fines, and costs.

47

¶ 113      Accordingly, we reverse and remand the imposition of fines on count VIII with instructions that the court account for any duration of Arjmand's compliance with section 304.9, as well as determine the proper date on which fines should begin. The court's calculation shall not include fines for violations after August 4, 2021.

¶ 114      Finally, Arjmand contends that the fines imposed on count X were unsupported by the evidence. He notes that he hired professionals to clean the property after this action commenced and that, on September 10, 2020, the County represented in court that Hoss had visited the property that day and observed that "[t]he yard ha[d] mostly been cleared of all the debris and broken glass." The County continued that Hoss found some debris in one corner of the property but that it was only "a little bit." After that day, Hoss did not visit the property again until February 22, 2022, at which point he averred that he observed the accumulation of debris. In response, the County highlights the language that the yard had been "mostly" cleaned, indicating that additional work was still necessary at that time. The County also argues that defendant failed to produce evidence that the debris had been fully cleared at the time of summary judgment.

¶ 115      The County's argument ignores that it was not Arjmand's burden to prove that he was *not* in violation of the ordinance in the first instance. See *Rosenwinkel*, 353 Ill. App. 3d at 549-550. Instead, it was the County's burden of proof to set forth evidence in support of each instance of an ordinance violation. *Id.* at 549. Considering that Hoss did not visit the property between September 10, 2020, and February 22, 2022, and that the County presented no evidence that that same corner of debris existed after September 10, 2020, the continuing imposition of fines was an abuse of discretion. We reverse and remand with instructions that the court impose fines only for the dates the County has established the existence of the violations alleged in count X through August 4, 2021.

¶ 116    While not raised by either party, we further observe that the court's imposition of fines for 612 days on count XI was an abuse of discretion. Arjmand admitted in his answer to the amended complaint that address numbers were not displayed on the property between July 9, 2020, and October 6, 2020 (90 days). In its addendum of fines, fees, and costs, the County alleged that the residence lacked address numbers from July 9, 2020, through "at least" February 10, 2021 (217 days). In its final motion for assessment of fees, fines, and costs, the County limited the fines sought on this count to 217 days. Notwithstanding, the court imposed fines for 612 days without any apparent evidentiary basis for doing so. Accordingly, we reverse and remand the fines imposed on count XI with instructions that the fines imposed on remand shall not be for less than 90 days or greater than 217 days.

¶ 117    In sum, we affirm summary judgment on the issue of liability on all counts of the amended complaint. We reverse all fines imposed for any violations that occurred as to any count after summary judgment was entered on August 4, 2021. We reverse and remand as to the pre-judgment fines imposed as to counts I, VIII, X, and XI. We affirm the pre-judgment fines imposed on the remaining counts, as they were not challenged on appeal.

¶ 118                                    C. Recusal

¶ 119    Finally, Arjmand challenges Judge Gibson's denial of his motion for recusal based upon Judge's Gibson's comment that defendant's credibility was limited without Arjmand having testified. Arjmand argues that his motion for recusal was improperly considered as a petition for substitution of judge for cause pursuant to section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2022)) and that, as a result, the court incorrectly utilized an "actual prejudice" standard instead of an "appearance of impropriety" standard. Judge Gibson's

comment, Arjmand continues, gives rise to the appearance of impropriety because it was made without having ever observed Arjmand and was otherwise without support in the record.

¶ 120    Initially, we note that Arjmand brought his December 2023 motion to recuse pursuant to Illinois Supreme Court Rule 63, which was repealed on January 1, 2023. Rule 63(c)(1) provided, in relevant part, "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned ***." This language is now located in Rule 2.11 of the Illinois Code of Judicial Conduct. Ill. Code Jud. Conduct (2023), Canon 2, Rule 2.11 (eff. Jan. 1, 2023). Because these rules are, in relevant part, identical, case law interpreting this portion of Rule 63(c)(1) may be referenced to interpret Rule 2.11, and we instead consider whether Arjmand's motion should have been granted under Rule 2.11.

¶ 121    Judges are expected to consider *sua sponte* whether their recusal is warranted in any given case. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 32. Recusal is a choice that "*rests exclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics ***." (Emphasis in original.) *Id.* ¶ 45. A judge has a duty to recuse where there is the "mere appearance of impropriety." (Internal quotation marks omitted.) *Id.* However, our supreme court has held that the mere appearance of impropriety is not enough to *force* a judge's removal from a case, as this easy-to-meet standard would encourage "judge-shopping." *Id.* ¶¶ 43-44. The Illinois Code of Judicial Conduct of 2023 does not say anything "that would give the impression that its provisions could be used by a party or his lawyer as a means to force a judge to recuse himself, once the judge does not do so on his own." *Id.* ¶ 45. Indeed, the preamble provides that it is not "intended to be the basis for litigants *** to obtain tactical advantages in proceedings before a court." Ill. Code Jud. Conduct (2023), Preamble (eff. Jan. 1, 2023).

¶ 122    Instead, a party who wishes to compel a judge's removal in a civil case must bring a motion pursuant to section 2-1001 of the Code of Civil Procedure (735 ILCS 5/2-1001) (West 2022)). *In re Marriage of Peradotti*, 2018 IL App (2d) 180247, ¶ 32; see also *In re S.D.*, 2011 IL App (3d) 110184, ¶¶ 25-26 ("Although attorneys may make the court aware of certain factors that could potentially require the trial judge to contemplate recusal, a party cannot compel a judge to step aside by 'moving' for recusal. If the parties are not satisfied with the court's ruling on an informal request for recusal, the parties may then file a motion for substitution under section 2-1001(a)(3) of the Code of Civil Procedure with the required affidavits in order to compel substitution in certain situations.").

¶ 123    Here, Arjmand argues only that Judge Gibson's comment raised the appearance of impropriety, rejecting the notion that Judge Gibson's conduct should be evaluated for actual prejudice pursuant to a motion for substitution of judge for cause. While we do not view Judge Gibson's remarks as suggestive of a bias against Arjmand, even if it were otherwise, the appearance of impropriety is not sufficient to compel a judge's removal from a case and a motion for recusal is the incorrect procedural vehicle to accomplish this. Accordingly, we affirm the denial of Arjmand's motion.

¶ 124                                III. CONCLUSION

¶ 125    For the reasons stated herein, we affirm in part and reverse and remand in part the judgment of the circuit court of Du Page County.

¶ 126    Affirmed in part; reversed in part; remanded in part.

51